**STATE of Minnesota, Respondent,**

v.

**Ross Hunter SHEPHERD, Appellant.**

**No. C6–90–2403.**

Supreme Court of Minnesota.

Nov. 22, 1991.

Rehearing Denied Dec. 13, 1991.

John M. Stuart, Public Defender, Cathryn Middlebrook, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Robert A. Stanich, Sp. Asst. Atty. Gen., St. Paul, and Marvin Ketola, Carlton County Atty., Carlton, for respondent.

KEITH, Chief Justice.

Defendant, Ross Hunter Shepherd, was convicted of first degree murder by a jury in district court and sentenced to life in prison. On direct appeal to this court, he argues: 1) that the evidence was insufficient to support the verdict of first degree premeditated murder and 2) that the trial court committed reversible error by refusing to instruct the jury on the lesser included offense of second degree felony murder. We affirm.

Defendant was twenty years old in 1989 when he struck and killed his stepfather, Wayne Hatinen, with a baseball bat. Defendant's relationship with Hatinen began in 1979 when his mother, Karen, who was divorced, began dating him. Karen and Wayne were married in 1984. This tragic event was the culmination of ten years of verbal and emotional conflict between defendant and Hatinen.

On the morning of August 15, 1989, defendant, who was living with his mother and Hatinen on Hatinen's beef cattle farm in Esko, Minnesota, got into a loud and angry argument over defendant's failure to relay a message. Around 6:00 p.m. that day, defendant was at home and on the phone with a friend. Hatinen, defendant's older brother Randy Shepherd and Randy's daughters were also at the farm. Steven Shepherd, defendant's younger brother, and a friend of Steven's stopped in at the farmhouse for a short period while defendant was on the phone. Steven and Hatinen got into an argument about putting up some hay. Hatinen yelled at defendant to get off the phone. He did so. Steven and his friend left.

Defendant went outside and then returned to the house to announce that the cows were loose. Hatinen went outside, ostensibly to round up the cows. There was never any evidence at trial as to whether the cows actually were loose.

Defendant, giving his version of what happened, testified that Hatinen was "walking out the door, and he was saying, goddamn it, son of a bitch, he was ragging again on me. And as I walked out the door, I was just—that was like the final straw, it just like snapped on me and I grabbed whatever was nearest to me, and it turned out to be ... the baseball bat. And I swung it at him and hit him."

Hatinen was hit at least twice; once in the front of the face and once on the rear of his skull. The second blow to the back of the skull was the fatal blow. Defendant then went into the house to get Randy.

Randy testified at trial that the defendant said "I've done it, I've done it" and that he had killed Wayne. Defendant went to get a tarp and a truck and Randy helped him place the body in the back of the truck.

Defendant then drove up north. He got lost while trying to find a friend's cabin and left the truck, with the keys in the ignition and the body in the back, in a cabin driveway on Boulder Lake. He eventually located the cabin and spent the night.

The following day, defendant hitchhiked back to the Esko farm and arrived about 15 minutes after Karen Hatinen had filed a missing persons report on defendant and Hatinen. She asked him where her husband was. Defendant answered that "he's up North" and that he was not coming home.

Police soon arrived at the Esko farm. Randy Shepherd told the police that he did not know anything of the circumstances of the death. Defendant was arrested and placed in a squad car. After waiving his *Miranda* rights, defendant told the officers that he had killed Hatinen and directed them to the body.

Defendant was indicted on a charge of murder in the first degree. At the trial, numerous witnesses testified about the general contentious relationship between defendant and Hatinen as well as about specific instances in which defendant expressed his feelings about his stepfather. A former girlfriend of the defendant testified that around 1987 and 1988 defendant said a couple of times that he wanted to kill his stepfather and that nobody believed that he would do anything. A friend of the defendant also testified that three years before the trial, there were a few times when defendant was upset and said he would like to kill his stepfather. Another friend of the defendant testified about more recent conversations with defendant that took place in July and August of 1989. He said defendant stated that his stepfather had hurt his mom and that he did not like him and would like to kill him. This friend stated that defendant talked of poisoning his stepfather. He testified that because of the way defendant said these words that he thought defendant was joking. Defendant's younger brother, Steven, also testified about similar conversations he had with defendant. He also said that he thought they were "just talk."

Randy Shepherd's testimony at trial was different from statements he had given earlier. He admitted that he had lied to the police who arrived on the scene on August 15, 1989; that he had lied to his mother; that he had lied to a Sheriff who had interviewed him on August 29, 1989; and that he had lied to the Grand Jury on September 6, 1989.[1] On direct examination by the state he was asked about a statement that defendant had directed at him on the afternoon of August 15, 1989. Randy replied: "It was—I can't give you a direct quote, but it was like something's going to happen tonight or it's—something's going to happen" The prosecutor then asked "[d]id he use the word fatal?" Randy replied "[y]es, that's what it is. Something fatal is going to happen."

The jury trial lasted five days. The trial judge denied the defense request for a jury instruction on felony murder (with assault as the underlying felony) and gave the standard instructions on murder in the first degree, murder in the second degree, and manslaughter in the first degree. The jury returned with a verdict of guilty of murder in the first degree.

### I.

Defendant argues that his conviction should be reversed or reduced on the grounds that there was insufficient evidence to support the verdict of first degree murder or to exclude a finding that defendant acted in the heat of passion. Minn. Stat. § 609.185(1) (1990) provides that whoever "causes the death of a human being with premeditation and with intent to effect the death of the person" is guilty of

---

1. After the grand jury proceeding Randy consulted a lawyer who recommended that he go to the sheriff and make a statement as to what really had happened. He testified that his testimony at trial was the same as he gave in that statement to the sheriff.

murder in the first degree and shall be sentenced to imprisonment for life.

In reviewing a claim based on sufficiency of the evidence, the process is "limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989) (citation omitted). Circumstantial evidence is entitled to as much weight as any other kind of evidence. *State v. Race*, 383 N.W.2d 656, 661 (Minn.1986). We, of course, subject circumstantial evidence to strict review but we also recognize that the " 'jury is in the best position to evaluate the circumstantial evidence surrounding the crime' ", and to determine the credibility and weight to give to the testimony of the witnesses. *State v. Bias*, 419 N.W.2d 480, 484 (1988) (quoting *State v. Race*, 383 N.W.2d 656, 662 (Minn.1986)). Premeditation, as defined by statute, means "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (1990) Premeditation is to be construed from events both before and after the death. *State v. Flores*, 418 N.W.2d 150, 157 (Minn. 1988). Extensive planning and calculated deliberations need not be shown in order to find premeditation. *State v. Wahlberg*, 296 N.W.2d 408, 415 (Minn.1980). While the manner of killing may support an inference of premeditation, "death from a series of blows cannot, alone, support a finding of premeditation in a first degree murder prosecution." *State v. Swain*, 269 N.W.2d 707, 714 (Minn.1978).

The jury could have discredited the testimony of defendant and credited that of the state's witnesses concerning the statements to defendant's friends, over a period of years, concerning his aversion for his stepfather and his desire to kill him. The jury could have reached the conclusion that the fatal blow to the back of the head was delivered by defendant to decedent while he was face down on the ground. Further-more, though the defense argued that the testimony of Randy Shepherd was suspect, the jury was free to credit his testimony that on the day of the killing, defendant told him that "something fatal was going to happen that night" and that immediately after the killing, defendant said to his brother, "I've done it."

Defendant argues that not only did the evidence not support a finding of premeditation but also that it was insufficient to exclude heat of passion as a mitigating factor. An intentional killing can be mitigated from murder to manslaughter if: (1) the killing is done in the heat of passion, and (2) the passion was provoked by words and acts of another such as would provoke a person of ordinary self-control under like circumstances. *State v. Buchanan*, 431 N.W.2d 542, 549 (Minn.1988); *see* Minn. Stat. § 609.20(1) (1990).

The first element of this test is subjective, *Buchanan*, 431 N.W.2d at 549, and "it is the emotional status of the defendant which is of primary importance in determining whether a homicide is murder or manslaughter in the first degree". *State v. Boyce*, 170 N.W.2d 104, 112 (Minn.1969). The second element of the test, provocation, is objective, *Buchanan*, 431 N.W.2d at 549.

The defense attempted to prove provocation via the testimony of the defendant. The jury was free to reject this testimony. Even if it credited the defendant's testimony, it could well conclude that it did not constitute sufficient provocation for a person of ordinary self-control to kill.

## II.

Defendant also argues that the trial court committed reversible error by refusing to instruct the jury on the lesser included offense of second degree felony murder.

Second degree felony murder [2] is a lesser included offense of first degree

2. Minn.Stat. § 609.19(2) (1990) provides, in pertinent part: "whoever ... causes the death of a human being, without intent to effect the death of any person, while committing or attempting

**516**

murder under Minn.Stat. § 609.04 subd. 1(1) (1990) (A lesser included offense is "a lesser degree of the same crime.") The standard for determining what lesser included offenses are to be submitted to the jury is well established. In *State v. Leinweber*, 303 Minn. 414, 422, 228 N.W.2d 120, 125–26 (Minn.1975), we set forth the test: is the evidence such as to reasonably support a verdict of guilty of the lesser offense and at the same time a verdict of not guilty of the greater offense? The determination of which, if any, lesser included offenses are to be submitted to the jury is a matter within the trial court's discretion. *State v. Merrill*, 428 N.W.2d 361, 369 (Minn.1988). Furthermore, the failure to submit lesser-included offenses to the jury is grounds for reversal only if the defendant is prejudiced thereby. *Bellcourt v. State*, 390 N.W.2d 269, at 273.

██ Dr. Donald Kundel, the forensic pathologist who is the medical examiner for St. Louis County, testified for the state. At trial, he described two wounds; the frontal wound and the blow to the rear of the head. It was his opinion that the frontal wound was the first injury and that the blow to the rear was delivered when the decedent was face down on the ground. It was also his opinion that it was the blow to the rear of the head that caused death. The blow to the rear shattered the skull bone and was "inflicted with a lot of force." On cross examination, Dr. Kundel stated that it was possible that more than two blows were delivered to the head.

Defendant admitted hitting the decedent two times. He testified that the first blow was delivered across the eyebrow area and that the second blow was to the side of the head and that he could not remember which side was hit. He denied that he hit decedent on the back of the head.

The defense tried to implicate Randy Shepherd as the person that delivered the blow to the back of the head. The question put to Randy Shepherd by the defense was: "Isn't it accurate, Mr. Shepherd, that you took the baseball bat when Ross went to get the car and struck Wayne Hatinen in

to commit a felony offense" is guilty of murder

the back of the head while he was lying on the ground?" Randy Shepherd answered: "No, it is not". The defense further tried to implicate Randy Shepherd by trying to impeach his testimony and by setting forth a motive. The defense never introduced any evidence that would show that it was Randy Shepherd who delivered the fatal blow.

The bulk of the evidence presented indicated that defendant intended to kill the decedent. The thrust of defendant's argument had virtually nothing to do with assault and was almost exclusively focused on proving intentional heat of passion manslaughter.

Finally, the fact that the jury concluded that there was premeditated intent to kill, even though they could have opted for either of the lesser included offenses actually submitted to them, is a strong and sufficient indication that the defendant was not prejudiced by the failure to have second degree felony murder submitted.

We conclude that the trial court did not abuse its discretion in refusing to instruct on felony murder.

The conviction of first degree murder is affirmed.