STATE of Minnesota, Respondent,

v.

Jon Earl QUICK, Appellant.

No. C0–02–86.

Supreme Court of Minnesota.

April 10, 2003.

John M. Stuart, State Public Defender, Cathryn Middlebrook, Assistant State Public Defender, Minneapolis, for appellant.

Jon Earl Quick, Bayport, for appellant *pro se*.

Mike Hatch, Attorney General, Kelly O'Neill Moller, Assistant Attorney General, St. Paul, Susan Rantala Nelson, Norman County Attorney, Ada, for respondent.

## OPINION

PAUL H. ANDERSON, Justice.

Appellant Jon Earl Quick was convicted in Norman County of the premeditated first-degree murder of Justin Mueller. Mueller was the boyfriend of Quick's estranged wife. On appeal, Quick seeks to have his conviction reduced to first-degree manslaughter, asserting that the state failed to prove beyond a reasonable doubt that he did not act in the heat of passion at the time of the shooting. In the alternative, Quick asserts that his conviction should be reversed and a new trial granted on the grounds he was denied his constitutional rights to present a defense and have a fair trial because the district court precluded testimony from three witnesses. In a supplemental pro se brief, Quick further contends that he did not receive a fair trial due to improper conduct by the judge, inadequate jury instructions, unfair and biased jury selection, inappropriate admission of evidence from an improper search, failure to prohibit his spouse from testifying at trial, ineffective assistance of counsel, and prosecutorial misconduct. We affirm.

Jon and Diane Quick were married on July 2, 1994, and less than a year later, moved to Ada, Minnesota. They had two children together and Diane had a child from a previous relationship. In May 2000, Diane told Jon she wanted a separation and in early June, Jon moved out of the family home. Jon then moved in with his cousin in Felton, Minnesota, approximately 15 miles from Ada. At first, Diane told Jon that the separation would be temporary and that they might still be able to work things out. Jon did not want the separation and asked Diane to go to marriage counseling, but she refused. Despite Jon's efforts at reconciliation, Diane filed for dissolution of the marriage on June 15, 2000. Diane also applied for, and was granted, a restraining order. In the application, Diane stated that her reasons for requesting the restraining order were Jon's "yelling and breaking of doors and panes of glass due to throwing things" and his inability "to handle [the] childrens crying or tempers in the right way." The restraining order prohibited Jon from go-

ing to the house in Ada except to visit the children on Saturdays, but allowed limited phone contact between Jon and Diane to address visitation issues.

Two months after Jon moved out, Diane began dating Justin Mueller, a good friend of her brother. Diane and Mueller's relationship soon became serious and Mueller was at Diane's home virtually every day. At some point, Jon became aware that Diane and Mueller were spending a considerable amount of time together, but he contends he was not aware of the seriousness of their relationship.

Despite the restraining order, Jon and Diane continued to have contact by telephone, notes, and e-mail on matters other than visitation, and Jon occasionally stayed with the children outside his scheduled visitation time. On Sunday, September 3, 2000, Jon went to the house to see the children, but Diane and Mueller had taken the children to Fargo. Jon left a note for Diane complaining that she was not around and that she was making it "impossible or very difficult" for him to see the children. The next day, Jon sent an e-mail to Diane which he addressed to "Di(rtbag)" and in which he wrote "[j]ust remember if you're going to act like a slut, or should I say be one, you need to learn to expect to be treated accordingly." Jon later apologized to Diane after learning that she had tried to contact him and tell him that the children would not be home for a visit.

On September 5, Jon made arrangements with Diane to go to the house to pick up a locket he had given her. Diane told Jon to come after 7:30 p.m. because she had to take one of the children to a school activity. When Jon arrived, Diane was not home and Mueller was mowing the lawn. Upset, Jon had some words with Mueller. He then went to the school and left a note on Diane's car that said, "Di, I'll bet you thought you were cute having me

stop by while Justin was mowing *your* lawn. Well he's still alive though I don't know why, but you can go 2 hell." Jon said he left the note to scare and upset Diane by making her think he had beat up Mueller. Shortly thereafter, Jon visited Diane's brother in Fargo and told him that upon seeing Mueller mowing the lawn, he could have grabbed the rifle from his trunk and shot Mueller. At the time of the incident, Jon did have a rifle and ammunition in the trunk of his car, but Diane's brother did not think Jon was serious when he made that comment about Mueller.

On the evening of September 14, Diane had friends, including Mueller, over to play cards. That same evening, Jon attended a parenting class in Moorhead and got home around 10:00 p.m. Upon arriving home, Jon discovered that Diane had left a message for him on the answering machine. He also noticed that the caller ID indicated that she had called several times. Jon had a drink, checked his blood sugar, and gave himself an insulin shot for diabetes. He then called Diane and learned that she had some friends over. He asked Diane who was at the house, but she refused to tell him. Soon after the call, the remaining card players left, leaving only Diane and Mueller to clean up before going upstairs to bed together.

After hanging up with Diane, Jon made his lunch for the next day and did some laundry. He testified that at this point he strongly suspected there was something going on between Diane and Mueller and he had to prove to himself that he could trust her. He called Mueller's residence to see if Mueller was home, but no one answered the phone. He then decided to drive to Ada.

Upon arriving in Ada, Jon drove around the block by Diane's home and saw that Mueller's car was parked in her driveway.

Jon observed a neighbor in the neighbor's backyard and drove around the block a second time because he did not want anyone to know that he was there. He then parked in Diane's driveway and saw that all the lights were off in the house. He took the loaded .22 rifle, which was still in its case, from the back seat of his car and approached the house.[1] Jon testified that at this point he wanted to scare and humiliate Mueller and planned to take Mueller four or five miles out of town and make him walk back.

Jon tried to enter the house through the back door, but it was locked. He next tried a basement window and was able to gain entrance. He then climbed the stairs to the first floor, unlocked the back door, took off his shoes, and took the rifle out of the case. He testified that the house was so quiet that it made him think he was jumping to conclusions, so he thought about leaving through the back door, but he just could not go. Jon further testified that he took his shoes off so that he could get back out of the house without anyone knowing he was there if there was no truth to his suspicions. He walked through the house and started up the stairs to the second floor where the master bedroom was. About three-fourths of the way up the stairs, Jon said he heard Diane giggle and he testified that he recognized the giggle as one he knew from their intimate moments together. He then ran up to the top of the stairs, turned on the light, and opened the door to the master bedroom.

Diane and Mueller were in bed together and Jon testified that Mueller was naked. Mueller got out of bed and moved toward Jon who was out in the hallway. Jon then fired the rifle five times. At trial, Jon stated that Mueller lunged toward him and tried to grab the rifle and he just reacted. After the last shot was fired, Mueller was laying face down in the hallway. When Diane heard the shots, she called 911. After the shooting, Jon closed the door to his children's bedroom across the hall and went back into the master bedroom. He knelt down on his knees and pointed the rifle at himself. Diane grabbed the rifle from him and ran outside with it. Jon covered Mueller's body with a blanket and went downstairs.

An Ada police officer and a Norman County sheriff's deputy responded to the 911 call. Shortly after they arrived, Diane came running out of the house carrying the rifle and yelling for help. While the deputy locked the rifle in the trunk of his squad car, the police officer went into the house with Diane and observed Mueller's body lying in the upstairs hallway covered with a blanket. The officer checked Mueller for a pulse and breathing and found none. After putting the rifle in his car, the deputy entered the house and found Jon sitting on the couch, hunched over with his elbows on his knees. Jon told the deputy he was sorry and asked, "Is he dead? Did I kill him?" Jon also said "I told her to wait until after the divorce." The deputy then arrested Jon and took him to the sheriff's department. On the way, Jon asked the deputy to shoot him.

The Ada police chief contacted the Minnesota Bureau of Criminal Apprehension (BCA) for assistance. A special BCA agent arrived in Ada around 1:00 a.m. on September 15, 2000. The agent met with Jon Quick at the Norman County jail and asked to interview him. Quick requested an attorney and the agent terminated the interview. Sometime later, the agent again approached Quick and asked for con-

---

1. Jon said that he had loaded the rifle less than a week earlier and moved it from the trunk to the back seat because there were skunks around the place where he was staying and he wanted to be prepared if he saw one.

sent to search his car and the room where he was staying. Quick agreed and executed a consent form authorizing a search of his car and his room. On the consent form, Quick initialed the clause that said he had the right to refuse to give consent and that no promises or threats had been made to him to induce him to consent. A search of the car revealed a container filled with numerous boxes of .22 caliber live rifle ammunition.

Dr. Susan Roe, the medical examiner, conducted the autopsy on Mueller. She concluded that Mueller had been shot five times—once in the left shoulder, once by the right armpit, twice in the back, and once in the forehead. Roe noted a grazing wound on the back surface of Mueller's right hand and scrapes and abrasions on Mueller's elbows and knees that were consistent with him falling to the floor. While the shots to the shoulder and armpit hit no vital organs, both shots to the back went through vital organs. Roe stated that Mueller would have been able to move for only a brief period of time after sustaining the wounds to his back before he lost consciousness. The bullet to the forehead fragmented, with part of the bullet going into the brain. Roe stated that the shot to the forehead was fatal and Mueller would have lost consciousness immediately.

Roe found noticeable stippling around the wounds to the left shoulder and right armpit, indicating that the rifle was within two feet when fired. In addition, Roe noted that in each case the projectile of the bullet was from up to down on Mueller's body. The state pointed out in its cross examination of Quick that Mueller was taller than Quick and, therefore, Quick had to be above Mueller when he fired each of the shots. The team leader who processed the crime scene stated that based on the blood patterns from the two wounds on Mueller's back, he believed that the upper wound occurred while Mueller's torso was in an erect position and it continued to bleed after Mueller's torso was on the ground. The other wound on Mueller's back occurred after Mueller was already on the ground. Roe concluded that the cause of death was multiple traumatic injuries due to multiple gunshot wounds.

Quick was indicted by a Norman County grand jury on one count of first-degree murder for the shooting death of Mueller and went to trial in October 2001. The district court provided jury instructions on both first-degree premeditated murder and first-degree heat of passion manslaughter. The jury returned a guilty verdict of murder in the first degree and the court sentenced Quick to life imprisonment.

I.

 Quick argues that his conviction should be vacated and the case remanded for sentencing on the lesser-included offense of heat of passion manslaughter. He asserts that the state failed to provide sufficient evidence to prove beyond a reasonable doubt that he did not act in the heat of passion. In reviewing a claim of insufficiency of the evidence, the scope of review is limited to ascertaining whether, based on the evidence presented at trial, the jury could have reasonably concluded that the defendant is guilty of the offense. *State v. Vick*, 632 N.W.2d 676, 690 (Minn. 2001). In doing so, we view the evidence "in the light most favorable to the jury's verdict and assume that the jury believed the state's witnesses and disbelieved the defendant's witnesses." *Id.* We will uphold the jury's verdict if, giving due regard to the presumption of innocence and to the state's burden of proving the defendant's guilt beyond a reasonable doubt, the jury could reasonably have found the defendant

guilty. *State v. Johnson*, 568 N.W.2d 426, 435 (Minn.1997).

■ "[C]ircumstantial evidence in a criminal case is entitled to as much weight as any other type of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational or reasonable hypothesis except for that of guilt." *State v. Wallace*, 558 N.W.2d 469, 472 (Minn.1997). The circumstances must "form a complete chain which, in the light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn. 1980). Even with this stricter standard, the jury determines the credibility and weight of the circumstantial evidence. *See Wallace*, 558 N.W.2d at 472. Therefore, we continue to assume the jury believed the state's witnesses and disbelieved the defendant's witnesses. *Id.*

■ To be guilty of first-degree premeditated murder, Quick must have caused the death of Mueller with premeditation and with intent to effect his death. Minn.Stat. § 609.185(a)(1) (2002). Premeditation means to "consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (2002). "A finding of premeditation does not require proof of extensive planning or preparation to kill, nor does it require any specific period of time for deliberation." *State v. Cooper*, 561 N.W.2d 175, 180 (Minn.1997). Premeditation is a state of mind and, therefore, generally proved through circumstantial evidence of the "defendant's words and actions in light of the totality of the circumstances." *State v. Brocks*, 587 N.W.2d 37, 42 (Minn.1998). "[T]he evidence as a whole may support a finding of premeditation even if no single piece of evidence

standing alone would be sufficient." *State v. Moore*, 481 N.W.2d 355, 361 (Minn. 1992).

■ In *Moore*, we recognized three categories of evidence that are relevant when inferring premeditation. *Id.* The first category is "facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity*." *Id.* (quoting Wayne R. Lafave & Austin W. Scott, Jr., *Handbook on Criminal Law* § 73 (1972)). Evidence of planning would include prior possession of the murder weapon by the defendant and surreptitious approach of the victim. *Id.; see, e.g., State v. Voorhees*, 596 N.W.2d 241, 247–48, 253 (Minn.1999) (bringing rifle to estranged wife's place of work and quietly approaching her when she went outside to smoke supported inference of premeditation); *Moore*, 481 N.W.2d at 361–62 (removing shotgun from normal storage under the bed, loading it, and placing it on the shelf in the living room before the killing showed planning).

■ The second category of evidence relevant to show premeditation is "facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred." *Moore*, 481 N.W.2d at 361 (quoting Wayne R. Lafave & Austin W. Scott, Jr., *Handbook on Criminal Law* § 73 (1972)). Evidence in this category includes prior threats by the defendant, plans or desires of the defendant that would have been advanced by the victim's death, and prior conduct by the victim known to have angered the defendant. *Id.; see, e.g., State v. Lodermeier*, 539 N.W.2d 396, 398 (Minn.1995) (arguing with the victim the night before the killing, the deterioration of the defendant and victim's relationship, and being angry with victim indicate premeditation); *State*

*v. Shepherd,* 477 N.W.2d 512, 515 (Minn. 1991) (noting that defendant had previously made statements about wanting to kill the victim).

 The last category of evidence is "facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design." *Moore,* 481 N.W.2d at 361 (quoting Wayne R. Lafave & Austin W. Scott, Jr., *Handbook on Criminal Law* § 73 (1972)). In this category, we look at the manner of the killing, such as evidence that the wounds were deliberately placed at vital areas of the body. *Id.* This court has also looked to the number of times the defendant used the weapon or the number of wounds inflicted, and the period of time between infliction of the wounds. *Lodermeier,* 539 N.W.2d at 398; *see, e.g., Cooper,* 561 N.W.2d at 179 (shooting victim 12 times with the fatal shot coming while victim was already down); *Lodermeier,* 539 N.W.2d at 398 (shooting victim four times at close range, three of the shots hitting the victim, and two of those shots inflicting fatal wounds).

 An intentional killing may be mitigated from first-degree murder to first-degree manslaughter if the defendant acted in the heat of passion. *State v. Auchampach,* 540 N.W.2d 808, 817 (Minn. 1995). Even if the defendant acted with premeditation, the defendant is guilty only of first-degree manslaughter if he also acted in the heat of passion. *Id.* Thus, for a defendant to be convicted of first-degree premeditated murder, not only must the state prove premeditation, but the state also has the burden of proving beyond a reasonable doubt the absence of heat of passion. *Id.* at 818.

 A defendant is guilty of heat of passion manslaughter if the (1) killing was committed in the heat of passion, and (2) passion was provoked by such words or acts of another as would provoke a person of ordinary self-control under the circumstances. *State v. Buntrock,* 560 N.W.2d 383, 386 (Minn.1997); Minn.Stat. § 609.20(1) (2002). The first element is a subjective inquiry and it is the emotional status of the defendant that is of primary importance. *Buntrock,* 560 N.W.2d at 386 (citation omitted). If a defendant is in the heat of passion, his reason would be clouded and his willpower weakened. *Id.* (citation omitted). Anger alone is not sufficient for heat of passion. *State v. Stewart,* 624 N.W.2d 585, 590 (Minn.2001). The second element, provocation, is an objective inquiry. *Buntrock,* 560 N.W.2d at 387. "[T]he words and acts of [another] must have been enough to provoke a person of ordinary self-control." *Auchampach,* 540 N.W.2d at 815.

Looking at the evidence here in the light most favorable to the guilty verdict, the jury could have concluded beyond a reasonable doubt that Quick premeditated the killing of Mueller and that he did not act in the heat of passion. Quick and his wife were in the process of getting a divorce and his wife had developed a close relationship with Mueller. Quick was upset about this relationship. He sent his wife e-mails calling her a "slut" and a "dirtbag" and left her a note saying that Mueller was still alive, but he did not know why. Quick had a rifle and ammunition in his car and he told his brother-in-law that he could have taken the rifle out of the car and shot Mueller after seeing him mow his wife's lawn. Suspecting that his wife and Mueller were together, Quick drove 15 miles to his wife's home late at night with a loaded rifle in his car. He drove around the block because he did not want a neighbor to know he was there. He broke into the

house taking the loaded rifle with him, took off his shoes so that he would not be heard, and removed the rifle from its case. Quick fired the rifle five times, all five shots hitting Mueller, three of them fatal. Quick told police when they arrested him "I told her to wait until after the divorce." In sum, we conclude there is sufficient evidence in each of the three categories-planning, motive, and nature of the killing—for the jury to have concluded that Quick killed Mueller with premeditation.

As we noted in *Auchampach*, even if there is sufficient evidence for the jury to have found premeditation, the jury also must find that there was a lack of heat of passion. *Auchampach*, 540 N.W.2d at 817. Quick contends that he killed Mueller in a heat of passion and a person of ordinary self-control would have similarly been so provoked.

In a similar case decided last year, a husband suspected that his wife was having an affair though she denied it. *State v. Carney*, 649 N.W.2d 455, 457 (Minn.2002). Within two hours of listening to a tape confirming his suspicions, the husband entered the other man's place of business and said "I'm sorry," to which the man responded, "Yeah, you should be sorry." *Id.* at 458–59. The husband then shot the other man in the head. *Id.* at 459. In *Carney*, we concluded that the district court did not err in ruling that the evidence did not support giving a heat of passion instruction. *Id.* at 462. We noted that for months the defendant was aware and suspicious of his wife's close relationship with the other man, he expressed feelings of jealousy and anger to friends and coworkers, and he physically confronted the other man on two occasions. *Id.* While acknowledging that the defendant's conduct before the shooting demonstrated some characteristics of desperation, we concluded that there was also a pervading

characteristic of anger, vengeful planning, and preparation. *Id.* We also concluded in *Carney* that the victim's response to the defendant's apology—"Yeah, you should be."—would not have rationally provoked a person of ordinary self-control. *Id.*

Similarly, Quick was aware and suspicious of his wife's relationship with Mueller and had shown anger and jealousy over their relationship in his comments to his wife's brother and through notes and e-mails sent to his wife. Quick's actions of driving 15 miles late at night, going around the block a second time to avoid being seen, sneaking into the house through a window, taking a loaded rifle with him, and taking off his shoes so he would not be heard all showed planning and preparation and not heat of passion. Moreover, given that Quick strongly suspected that there was a relationship between his wife and Mueller and that Mueller was at the house with his wife, hearing his wife giggle and finding them together was not sufficient provocation to justify a heat of passion killing. Therefore, we hold that there is sufficient evidence for the jury to have determined that Quick killed Mueller with premeditation and without heat of passion.

## II.

■ Quick also contends that he was denied his constitutional rights to present a defense and to a fair trial when the district court precluded the testimony of his attorney and two marriage counselors regarding his state of mind. Under the due process clauses of the Fourteenth Amendment of the United States Constitution and Article I, Section 7 of the Minnesota Constitution, "every criminal defendant has the right to be treated with fundamental fairness and 'afforded a meaningful opportunity to present a complete defense.'" *State v. Richards*, 495 N.W.2d 187, 191 (Minn.1992) (quoting *Cal-*

ifornia v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). The United States Supreme Court has recognized that the right to present a defense encompasses the right to offer the testimony of witnesses so that the defense can present its version of the facts to the jury as well as the state so that the jury can decide where the truth lies. Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

■ While the right to present witnesses is constitutionally protected, that right is not unlimited. A defendant still "'must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" Richards, 495 N.W.2d at 195 (quoting Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). Therefore, even in cases such as this where the defendant contends that his constitutional rights have been violated, evidentiary questions are reviewed for abuse of discretion and any error is subject to harmless error analysis. State v. Greer, 635 N.W.2d 82, 91 (Minn.2001); State v. Profit, 591 N.W.2d 451, 463 (Minn.1999).

■ Here, the district court excluded the testimony of Quick's attorney and marriage counselors because the court found the testimony irrelevant.[2] "[E]vidence must be relevant to be admissible." State v. Steward, 645 N.W.2d 115, 120 (Minn.2002). Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. Nonetheless, evidence that is "'repetitive * * *, only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues'" may be excluded. Crane v. Kentucky, 476 U.S. 683, 689–90, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (citation omitted).

Quick contends that the excluded testimony is relevant to his state of mind before the shooting and would negate the state's claim that he was angry over the situation and planned and premeditated the shooting. Quick also asserts that the state introduced evidence of his remarks to his wife's brother and the notes he wrote to his wife to show premeditation and lack of heat of passion. He claims that he likewise should be able to present similar evidence for his side. Finally, Quick contends that testimony from these disinterested persons would help to put his whole situation into perspective.[3]

---

2. The dissent asserts that the state's main argument for excluding the testimony was not that the evidence was irrelevant, but that the three witnesses might offer character evidence concerning Diane Quick and Mueller. While the state did argue that the evidence should not be admitted as character evidence, the state's concern was twofold. The state also argued that the testimony was irrelevant because it related to events that occurred well before the shooting, and events that are distant in time cannot give rise to heat of passion.

3. The dissent asserts that the state was allowed to offer "anecdotal evidence that indirectly bore on Quick's state of mind," but that "the court excluded the testimony of disinterested professional witnesses who would have directly addressed Quick's state of mind." Here, the state's evidence consisted of a note left by Quick for his wife which said, "Well he's still alive though I don't know why" and testimony of Diane's brother that Quick told him he could have grabbed the rifle from his trunk and shot Mueller when he saw him mowing the lawn. Rather than being "anecdotal" evidence, the state's evidence included direct statements made by Quick, reiterated to the court by the witnesses. From this evidence, the jury is left to make its own conclusion as to Quick's state of mind.

Determination of a person's state of mind is the primary consideration in concluding whether he acted in the heat of passion or with premeditation. For a heat of passion killing, the relevant time frame to be examined is the defendant's state of mind at the time of the killing. By its very definition, heat of passion requires some immediate reaction to some current provocation.[4] Thus, testimony of Quick's state of mind months before the shooting would not necessarily be relevant to his heat of passion argument and could be properly excluded for that purpose.

■ While heat of passion is formed at the time of the killing, premeditation can be formed well in advance of the killing. Consequently, Quick's state of mind during the summer could be relevant in determining whether Quick premeditated the murder of Mueller. In this case, however, there are a number of factors supporting the district court's conclusion that the excluded testimony is not relevant. First, Quick's meetings with his attorney and the marriage counselors, with the exception of one meeting with his attorney on September 6, 2000, all occurred at least one month before the shooting.[5] Quick's state of mind and intentions toward Mueller could

have changed substantially between the times he first met with his attorney and marriage counselors and the time of the shooting. During this time period, he learned more and more about the seriousness of his wife's relationship with Mueller and he began to realize that his marriage was over.[6]

Second, in the past, we have concluded that the past history of the victim and defendant's relationship is relevant in determining the issue of premeditation. *State v. Bauer*, 598 N.W.2d 352, 364 (Minn. 1999). In this case, however, the excluded testimony is predominately about the relationship between Quick and his wife, not between Quick and Mueller. A review of the proposed testimony of the three witnesses indicates that while Quick talked to them, particularly the marriage counselors, about his feelings for his wife and their relationship, there was little discussion about Quick's thoughts regarding Mueller. In fact, before the shooting Quick never mentioned Mueller to his attorney and only told his marriage counselors that he knew his wife was spending time with another man, not Mueller in particular.[7] There was no specific discus-

---

4. Heat of passion is defined as "Rage, terror, or furious hatred suddenly aroused by some immediate provocation, [usually] another person's words or actions." Black's Law Dictionary 726 (7th ed.1999).

5. Quick met with his first marriage counselor three times between June 23, 2000 and July 7, 2000, his second marriage counselor three times from July 13, 2000 to August 1, 2000, and his attorney three or four times between July 13, 2000 and September 6, 2000. In the meeting with his attorney on September 6, 2000, Quick indicated that he was considering suspending visitation with his children because he was having difficulty with his wife, but he did not discuss Mueller or Mueller and his wife's relationship.

6. Contrary to the dissent's claim, we do not assert that testimony regarding a defendant's

state of mind is irrelevant if it is not "up to the minute of the shooting"; rather, we simply recognize that a defendant's state of mind can change substantially based on the time span between events, especially in the emotionally charged circumstances surrounding the dissolution of a marriage. At some point, the court must exercise its discretion by drawing the line or trials could go on indefinitely as a defendant presents witness after witness to testify to his "state of mind" throughout his life.

7. In his meetings with his first marriage counselor, Quick blamed himself for the separation and wanted help saving his marriage. He was troubled that his wife was spending a lot of time with friends, particularly one male friend, and that she did not seem sad about the separation. In his meetings with his sec-

sion about how Quick felt about this other man. While the excluded testimony would have certainly been relevant if Quick had killed his wife, it is not as relevant in determining whether Quick premeditated the murder of Mueller.

Third, the relevant facts that would have been provided by the excluded testimony were that Quick was surprised by the separation and did not want the dissolution. He believed at first that the separation was temporary, but eventually began to realize that he and his wife were unlikely to reconcile, and he was aware of his wife's relationship with another man. This information was introduced through the testimony of Quick, his wife, and his wife's brother, thereby making the excluded testimony cumulative.

Finally, Quick contends that the testimony of his attorney and marriage counselors would show that while he was despondent and unwilling to accept the impending marriage dissolution, he was not angry. Quick offered transcripts of interviews with his attorney and marriage counselors conducted by an investigator of the Public Defender's Office as proof of what the proffered witnesses would say if they were allowed to testify. A review of the transcripts indicates that the attorney and first marriage counselor did not describe Quick as necessarily angry, but found him to be troubled by the separation. The second marriage counselor did indicate that Quick changed marriage counselors because he did not believe the first counselor adequately addressed his anger issues. The second counselor also indicated that Quick told her he was "very jealous" and talked about hiring a private investigator because

he believed his wife was seeing another man. A review of the transcripts of the interviews with the three witnesses indicates that instead of showing that Quick was not angry, the testimony would indicate that while Quick was initially shocked and blamed himself for the separation, he became more troubled and even angry as he learned more about his wife's relationship with another man.

■■■ A defendant has a constitutional right to present a defense, which includes the right to offer the testimony of witnesses so that the defense can present its version of the facts to the jury. *Richards,* 495 N.W.2d at 191; *Washington,* 388 U.S. at 19, 87 S.Ct. 1920. But that right is limited by the evidentiary rules, which preclude the admission of evidence that is repetitive, marginally relevant, or poses an undue risk of harassment, prejudice, or confusion. *Greer,* 635 N.W.2d at 91. Quick contends that while the state was allowed to admit evidence of a threatening note and a comment made to his wife's brother as a way of showing premeditation, his right to present a defense was violated when he was precluded from presenting the testimony of the three witnesses which he believed negated a finding of premeditation.

A review of the evidence indicates that the note and Quick's comment to his wife's brother occurred in early September, a little over a week before the shooting. The excluded testimony, on the other hand, involved meetings between Quick and his attorney and marriage counselors, the majority of which occurred at least one month before the shooting. The note and comment related specifically to Mueller

---

ond marriage counselor, Quick indicated that he was very jealous—he knew his wife was seeing another man—and he was having a hard time with the marriage dissolution. Quick did not generally talk with his attorney

about his relationship with his wife other than to say he did not want the dissolution and he was thinking of suspending visitation with his children because he was having a hard time dealing with his wife.

and thoughts of killing Mueller. The excluded testimony, however, would have involved Quick's feelings about his wife and their relationship, and not about Mueller. In fact, Quick never mentioned Mueller by name to either his attorney or marriage counselors. Given both the timing of the meetings and the content of the excluded testimony, we are hard pressed to conclude that the excluded testimony would be anything more than marginally relevant to show lack of premeditation. While another district court might have chosen to admit the excluded testimony and would not have erred in doing so, we hold here that the district court did not abuse its discretion when it excluded the testimony of the attorney and the marriage counselors.

■■■ Assuming arguably, however, that the exclusion of the testimony was in error, we will not reverse a district court's decision if it is found to be harmless beyond a reasonable doubt. *State v. Kelly*, 435 N.W.2d 807, 813 (Minn.1989). A defendant who claims the court erred in admitting evidence has the burden of showing the error and any resulting prejudice. *State v. Lynch*, 590 N.W.2d 75, 80 (Minn. 1999). In applying the harmless error test, we "must look to the basis on which the jury rested its verdict and determine what effect the error had on the actual verdict. If the verdict actually rendered was surely unattributable to the error, the error is harmless beyond a reasonable doubt." *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997) (citation omitted). In other words, if the evidence had been admitted and the damaging potential of the evidence fully realized, we must be satisfied beyond a reasonable doubt that a jury would have reached the same verdict. *State v. Post*, 512 N.W.2d 99, 102 (Minn. 1994). If "there is a reasonable possibility that the verdict might have been different

if the evidence had been admitted, then the erroneous exclusion of the evidence" is not harmless error. *Id.*

The inclusion of the excluded evidence would not have prompted the jury in this case to have convicted Quick of the lesser offense of heat of passion manslaughter. There is ample evidence that Quick acted with premeditation that night when he drove around the house twice waiting for a neighbor to go inside so no one would know that he was there, entered the house carrying a loaded rifle, took off his shoes so he would not be heard, and sneaked up the stairs knowing that he was likely to find his wife and Mueller together in a bedroom. Quick had numerous opportunities to turn around and to leave the house, but he chose not to do so. The evidence indicates that Quick must have known what he was going to find when he entered his wife's bedroom that night. Quick admitted that he strongly suspected that Mueller and his wife were having an affair. He knew Mueller was at the house earlier that night and that Mueller was not home when he tried to call him. Quick saw Mueller's car in his wife's driveway and saw that all the lights were off in the house. Quick's claim of heat of passion lacks merit when he put himself in a position to confirm what he already knew. Even if the exclusion of the evidence was in error, we conclude that it would be harmless error and we would not overturn the conviction on these grounds. Therefore, we hold that even if the court did err when it excluded the testimony of Quick's attorney and marriage counselors, the error was harmless.

### III.

In his supplemental pro se brief, Quick contends that he did not receive a fair trial due to ineffective assistance of counsel and prosecutorial misconduct. He also con-

tends that the court erred in hurrying the case forward, providing improper jury instructions, permitting prejudicial selection of jurors, allowing inadmissible evidence, and permitting his wife to testify.[8]

A review of the record indicates that a number of the alleged errors raised by Quick were not objected to at trial. Generally, if a defendant fails to object at trial to a particular error, the defendant is deemed to have forfeited his right to have the alleged error reviewed on appeal. *State v. Litzau,* 650 N.W.2d 177, 182 (Minn.2002). However, we have the discretion to review an issue on appeal if it is plain error. *State v. Burg,* 648 N.W.2d 673, 677 (Minn.2002). Under the plain error test, the defendant must show: (1) error; (2) that is plain; and (3) that affected substantial rights. *Id.* If these three factors are met, we may correct the error only if the fairness, integrity, or public reputation of the judicial proceeding is seriously affected. *State v. Strommen,* 648 N.W.2d 681, 686 (Minn.2002).

## A. Ineffective Assistance of Counsel

Quick asserts that he had ineffective assistance of counsel because his counsel failed to: (1) poll the jury, (2) call any character witnesses, (3) use statements from his sister, (4) pursue a medical defense, (5) obtain all necessary discovery, (6) object to confusing and noninformative jury instructions, and (7) expose weaknesses in the state's investigation. To succeed on a claim of ineffective assistance of counsel, a defendant must affirmatively prove that his counsel's representation fell below an objective standard of reasonableness, and but for counsel's errors, there is a reasonable probability that the results of the proceeding would have been different. *State v. Lahue,* 585 N.W.2d 785, 789

(Minn.1998) (citation omitted). There is a strong presumption that a counsel's performance falls within a wide range of reasonable assistance and even if there were errors in the counsel's performance, the defendant must still show that he was prejudiced as a result. *Id.* at 789–90.

We have previously determined that an attorney's decision regarding trial tactics lies within the proper discretion of the attorney and will not be later reviewed for competence. *Voorhees,* 596 N.W.2d at 255. To that end, we have concluded the determination as to what evidence to present at trial, such as what defenses to raise and what witnesses to call, represents an attorney's decision regarding trial tactics and will not be reviewed. *Id.* Four of the claims raised by Quick—failure to call any character witnesses, failure to use statements from his sister, failure to pursue a medical defense, and failure to expose weaknesses in the state's investigation—represent trial tactics and therefore will not be reviewed for competence. The first claim, failure to poll the jury, would not have had an impact on the verdict and therefore does not demonstrate ineffective assistance of counsel. As for the claims of failure to obtain all necessary documents and failure to object to confusing and noninformative jury instructions, Quick failed to demonstrate what discovery was not obtained by his attorney or how the jury instructions were improper or how he was prejudiced. Therefore, we hold that Quick's claims of ineffective assistance of counsel are without merit.

## B. Prosecutorial Misconduct

Quick next alleges three instances of prosecutorial misconduct: the state's failure to turn over evidence favor-

---

**8.** The marriage relationship between Jon and Diane Quick was dissolved before the trial; however, for continuity, we will continue to refer to Diane Quick as Quick's wife.

able to the defense, the state's use of unnecessary time to present its case, and the state's tampering with testimony which unfairly biased the jurors against the defendant. To succeed on a claim of prosecutorial misconduct, Quick must show that prosecutorial misconduct occurred and the misconduct is "so serious and prejudicial that [his] right to a fair trial is denied." *Id.* at 253 (citing *State v. Smith*, 541 N.W.2d 584, 588 (Minn.1996)). We have reviewed the record and conclude that Quick's allegations of prosecutorial misconduct are without merit.

### C. Improper Conduct by the Judge

■ Quick asserts that the judge was in a hurry to finish the trial because he was missing a meeting. While Quick's attorney did object at one point to the judge's aggressive scheduling timeframe, Quick fails to articulate how he was prejudiced by the judge's actions. In *Louden v. Louden*, we concluded that "[a]n assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection." 221 Minn. 338, 339, 22 N.W.2d 164, 166 (1946). Because prejudicial error to the defendant is not apparent in this case, we hold that this issue is waived.

### D. Inadequate Jury Instructions

■ Quick contends that the jury instructions were confusing and noninformative. The district court gave the recommended jury instructions for premeditated murder in the first degree and manslaughter in the first degree (heat of passion). Neither party objected to the jury instructions at trial. Thus, absent plain error, the matter is deemed waived. *Litzau*, 650 N.W.2d at 182. Quick also argues that the court did not adequately respond to the

jury's request for a definition of "heat of passion" when the court simply cited to the language in the jury instructions. Quick asserts that Black's Law Dictionary gives a "more explanatory and thorough definition for heat of passion" and that this definition should have been provided to the jury. Both the state and Quick's counsel agreed that the court's response was appropriate and did not object at trial. Therefore, this matter is also deemed waived absent plain error. *Litzau*, 650 N.W.2d at 182. Quick has made no showing that there was any error with the instructions or the court's response in referring the jury to the jury instructions, much less plain error that would require this court's review. Because Quick has failed to show plain error for either claim, we hold the issue of inadequate jury instructions is waived.

### E. Unfair and Biased Jury Selection

■ Quick contends that the district court showed prejudice by striking jurors slightly biased in favor of Quick while forcing him to use peremptory challenges on jurors showing bias against him. He also asserts that this problem was exacerbated by the fact that most of the men in the community were employed in agriculture, and because the trial was during a busy time of the year for agriculture, the men were excused, which resulted in an unbalanced jury consisting of nine women and three men. Once again, Quick failed to object at trial and has not shown plain error. We hold that this issue is waived.

### F. Inappropriate Admission of Evidence from an Improper Search

Quick contends that three pieces of evidence should not have been admitted because of an improper search: (1) a computer and letters taken from the room he was staying in at his cousin's home, (2) shells

taken from the trunk of his vehicle, and (3) notes taken from his wife's home. The computer and letters taken from his room were not admitted into evidence and are, therefore, outside the record and not an issue. *See Thiele v. Stich*, 425 N.W.2d 580, 582–83 (Minn.1988). As for the shells and the notes, Quick contends that both the search of his vehicle and the search of his wife's home were improper because the search warrant was not valid. Quick argued at the Omnibus hearing that there were insufficient facts to support the section of the search warrant which allowed a no-knock entry and a nighttime search and that some search of his wife's home occurred before the issuance of the warrant.[9]

With regard to the no-knock entry, both the application for the search warrant and the search warrant itself are not clear as to whether a no-knock entry was requested or authorized. On both documents, the specific statement addressing a no-knock entry was marked as "N/A," while the general boilerplate language allowed for a no-knock entry. While these discrepancies make the warrant less than clear, it appears that neither the police nor the judge intended to include a no-knock entry in the warrant. Both purposefully marked the

specific statement referring to a no-knock entry as N/A, while failing to cross out other language to the contrary. Further, the record is not clear whether the warrant was actually executed with a no-knock entry. Thus, we cannot say that the search was improper due to the inadvertent inclusion of a no-knock entry in the search warrant.

■ As to the nighttime search provision, search warrants are to be executed between the hours of 7:00 a.m. and 8:00 p.m. unless the court determines that a nighttime search is necessary. Minn.Stat. § 626.14 (2002). In this case, both the house and Quick's vehicle in the driveway were part of a crime scene. Because of the necessity of preserving and testing evidence at a crime scene in a timely manner, the nighttime provision was justified. Therefore, we conclude that Quick's argument that the search warrant is improper because of the nighttime provision is without merit.

■ In his brief for the Omnibus hearing, Quick also asserted that some search of his wife's home must have occurred before the issuance of the search warrant

9. Quick also argued at the Omnibus hearing that his consent to a search of his car and the room he was staying in was unconstitutionally obtained. Quick consented to a search of his car and room after he told authorities he wanted an attorney. The United States Supreme Court has said that once an accused has asked for an attorney, all interrogation of the accused by authorities must stop until counsel is made available to him, unless the accused himself initiates further communication. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Quick contends that because he requested an attorney, the BCA agent's subsequent request for his consent was improper. The district court concluded that the request for permission to search was not an interrogation and, therefore, the search was proper.

We have not previously addressed whether a request to consent to a search is an "interrogation" and therefore improper after a defendant has requested an attorney. Because the admission of the rifle shells found in the trunk of Quick's car is in any case harmless error, we decline at this time to address the issue of whether consent to a search is an interrogation. Quick admitted that the rifle used to kill Mueller was his and the BCA could conclusively say that four of the five bullets that went into Mueller and the casings found at the scene came from Quick's rifle. Thus, the fact that Quick had additional ammunition in the trunk of his car would not have substantially affected the verdict as required under a harmless error analysis and thus, we conclude that this issue lacks merit under the facts and circumstances of this case.

because the warrant included information about personal items of Quick's being on the premises, including his vehicle, and that a body was found. This information, however, was obtained when the police first arrived on the scene after receiving the 911 call from Quick's wife and upon entering the house to arrest Quick and check on Mueller. In addition, Quick failed to provide any evidence in support of this contention. We therefore hold that Quick's argument that the search was improper because is occurred before the issuance of the search warrant is without merit.

We note that the district court found Quick did not have capacity to object to the search of the house because he did not reside there, was barred by a restraining order, and was a trespasser at the time of the incident. Because we conclude that the warrant for the search of the house and Quick's vehicle was proper, we need not address the issue of capacity.

### G. Failure to Prohibit Spouse from Testifying at Trial

■ Finally, Quick contends that his wife should not have been allowed to testify against him at trial. This issue was not raised at trial and therefore is waived unless there is plain error. *Litzau,* 650 N.W.2d at 182. Minnesota Statutes section 595.02, subd. 1(a) (2002), provides two different marital privileges: (1) spouses cannot testify for or against each other without the other's consent during the course of the marriage, and (2) neither spouse can testify at any time, during or after the marriage, regarding confidential interspousal communication made during the course of the marriage. In this case, the first privilege does not apply because Quick was divorced from his wife at the time of the trial. As for the second privilege, his wife did testify to e-mails and

notes between them while their divorce was pending. The notes were left by Quick at his wife's home or on her car and therefore would not be confidential communication and the privilege would not apply. As for the e-mails, both sides introduced various e-mails between Quick and his wife, but the record is not clear as to the source of the e-mails—whether they were off of Quick's or his wife's computer. Quick makes no showing that the e-mails were obtained from his computer and were confidential. Thus, there is no plain error, and we hold that this issue is waived.

Affirmed.

HANSON, Justice (concurring in part, dissenting in part).

While I concur with the majority's decision that the evidence was sufficient to prove that Quick acted with premeditation and without heat of passion, and that Quick's pro se arguments are without merit, I respectfully dissent on the determination that the district court properly excluded the testimony of three defense witnesses as being irrelevant, and that such exclusion was harmless error. I would conclude that the testimony of the three defense witnesses was relevant to the issue of premeditation and that the exclusion of their testimony denied Quick his constitutional right to present a defense and was prejudicial error.

### I.

The majority opinion recognizes that "Quick's state of mind during the summer [of 2000] could be relevant in determining whether Quick premeditated the murder of Mueller," but ultimately concludes that the district court did not abuse its discretion in excluding evidence on Quick's state of mind as irrelevant. The majority mentions four grounds to support the district court's discretion: (1) the testimony con-

cerned Quick's state of mind "months before the shooting"; (2) the testimony concerned "the relationship between Quick and his wife," not the relationship between Quick and Mueller; (3) the testimony was cumulative to "the testimony of Quick, his wife and his wife's brother"; and (4) the transcripts of the police interviews with the three witnesses, which constituted Quick's offer of proof, did not support Quick's claim that they would show his lack of anger. Before addressing each of these four grounds, it is important to consider precisely what grounds were relied upon by the district court, whose discretion is being reviewed.

The state's original pretrial motion in limine to exclude the testimony of these three witnesses was not based solely, or even primarily, on grounds of irrelevance, but on grounds that the three witnesses might offer character evidence concerning Diane Quick and Justin Mueller. In fact, the district court characterized the state's motion as one "to exclude evidence of the character of Diane Quick or Justin Mueller." The state did argue that the transcripts of interviews with these three witnesses concerned events that "were all somewhat distant in time from the homicide," but it also expressed concern with the statements about the type of person Diane was, which was inadmissible as character evidence. Quick's counsel explained that the evidence would focus on Quick's state of mind: "[w]e do not intend * * * to attack Mr. Mueller or Ms. Quick," but instead "[w]e're going to talk about Jon, the way Jon was handling this, and his reluctant acceptance of the divorce, his reluctant acceptance of the circumstances, his reluctant acceptance that he was going to have less contact with his children. And that will lay the foundation for Mr. Quick's ultimate testimony in this case."

The district court did not rule on that motion in limine prior to trial, but waited until the state's case was almost complete. By that time, Diane Quick had already testified and the state acknowledged that any concerns about character evidence had become moot. The state also agreed that it would be fair to characterize the proffered testimony as bearing on "defendant's state of mind at the time he spoke with these individuals." The court then announced its decision, only stating "I'm not going to allow that evidence because I don't think it's relevant." No further explanation was given and no specific grounds to support the relevancy determination were mentioned. Thus, we can only speculate about how the court exercised its discretion or what factors informed that discretion. And, it must be underscored, the district court decided to exclude this testimony before it heard the testimony of Quick and before it was certain that Quick would testify in his own defense.

*A. Months before the Shooting*

Perhaps the district court considered, as the majority opinion speculates, that the proffered testimony was irrelevant because it concerned Quick's state of mind at least one month before the shooting and Quick's state of mind "could have changed substantially" during this month. But this consideration goes to the weight of the proffered testimony, not to its admissibility.

First, the relevant timeframe is quite short to begin with. The shooting occurred on September 14, 2000, and the parties had only separated in May 2000, for a total timeframe spanning only about four months. The interview transcripts describe conversations that occurred with Quick's first marriage counselor in three meetings on June 23 and 30 and July 7; with his second marriage counselor in

three meetings on July 13 and 18 and August 1; and with his attorney in at least three meetings on July 13, August 15 and September 6. Thus, the first marriage counselor had the opportunity to observe the evolution of Quick's mental and emotional state to within two months of the shooting; the second marriage counselor had the opportunity to observe the evolution of Quick's mental and emotional state to within 45 days of the shooting; and the attorney had the opportunity to observe the evolution of Quick's mental and emotional state to within eight days of the shooting.

In a first-degree murder trial, where the defense admits that the defendant was the shooter and premeditation is the critical issue, it seems highly unproductive to apply a heightened relevancy standard to screen the defendant's testimony on mental and emotional state simply because it is not up to the minute of the shooting. Viewed from another perspective, while the state offered anecdotal evidence that indirectly bore on Quick's state of mind, the court excluded the testimony of disinterested professional witnesses who would have directly addressed Quick's state of mind. And Quick's last meeting with his attorney occurred after the events described in the state's evidence.

### B. Relationship with Diane Quick, not Mueller.

If evidence of a relationship between a defendant and the victim is generally admissible to show premeditation, then surely evidence about the relationship between a defendant and his estranged wife, who had become romantically involved with the victim, is equally relevant. It is unrealistic to separate Mueller from Diane Quick in this analysis. Quick shot Mueller when he found him in an intimate setting with his wife. Of course, Quick's issues were with

his wife, not directly with Mueller, but it is not a leap in logic to conclude that his jealousy over his wife's conduct would be directed against the stranger who had taken his place in his wife's life.

More importantly, the proffered testimony was not focused on the relationship between defendant and Diane Quick (particularly after Quick's counsel made it clear that he was not going to attack the character of Diane Quick), but on Quick's state of mind as a result of the break up of the relationship.

### C. Cumulative to Testimony of Quick, Diane Quick and Fredrick Flood.

The district court could not have considered the proffered testimony of these three witnesses to be cumulative of the testimony of Quick because it ruled to exclude that testimony before the state rested. Quick had not yet testified and he retained the right under the Fifth Amendment to decline to testify. Further, a criminal defendant is denied the constitutional right to defend himself if he is restricted to his own testimony and not permitted to offer corroborating evidence. Obviously, the exclusion of third-party testimony to explain a defendant's state of mind puts undue pressure on the Fifth Amendment rights of the defendant.

As to Diane, she was a hostile witness to Quick. She testified that Mueller was the best friend of her brother, Fredrick Flood; that their relationship built incredibly fast after her separation from Quick; and that they intended to be married. She then witnessed Quick shoot Mueller in her own home, while her three children were sleeping in nearby rooms.

Further, Diane had obtained an order for protection against Quick in June of 2000 and did not testify to any face-to-face meetings or even live telephone conversations with Quick from that date to the date

of the shooting. Her communications were only by note, email or voice message. Thus, during the entire time that Quick was meeting with the three proffered witnesses, and discussing his mental and emotional state, Diane Quick had no direct contact with him. Obviously, she did not corroborate Quick's testimony.

As to Diane's brother, he likewise was hostile to Quick. He acknowledged that Justin Mueller had been a co-worker and was his best friend. He said that he was excited that Mueller and his sister, Diane, were dating. He testified to only one communication with Quick in the relevant time period and the state offered that testimony to show premeditation.

Neither Diane Quick nor Diane's brother testified directly about their observations of Quick's mental or emotional state in the summer of 2000.

*D. The Proffered Testimony was not Supportive of Quick's Defense.*

As a matter of convenience, Quick's counsel used the transcript of interviews with these three witnesses as the offer of proof. While these transcripts adequately supply the substance of what each witness would testify, they obviously do not reflect the precise way that Quick's counsel would want to develop that testimony. That being said, the transcripts do describe a progression in Quick's mental and emotional state, from denial, to self-blame to acceptance. The general tone of the interview transcripts is that Quick was approaching this issue calmly, without signs of anger. To the extent there are statements that might contradict that tone, or tend to show anger, those statements do not render the entire testimony irrelevant but simply provide fruit for cross-examination.

In sum, none of these grounds supports the exclusion of this testimony.

## II.

The majority opinion goes on to conclude that, even if erroneous, the exclusion of the testimony would be "harmless beyond a reasonable doubt." In my view, the harmless error analysis should only rarely be employed in a situation where a defendant has been denied his constitutional right to present a complete defense. Further, the use of a harmless error analysis to resolve criminal appeals often allows the prosecution to have it both ways. First, the prosecution fights to exclude evidence favorable to a defendant and then, when successful, argues on appeal that the evidence would not have been that important and surely would not have changed the verdict. Obviously, the state perceived the testimony of the three defense witnesses to be prejudicial to the state, so much so that it pursued a motion in limine before the witnesses could even be called to the stand. Simultaneously, the state planned to offer its own evidence on premeditation, leaving Quick with the only option of supplying his own testimony on the subject. I would take the state at their first word—the state's motion in limine tells the court that the evidence would be prejudicial and the state's argument on appeal should not be otherwise.

Finally, I am not comfortable placing myself in the shoes of this jury and determining whether or not this relevant evidence could have affected the jury's thinking on the issue of premeditation. Perhaps the state's evidence was so overwhelming that a juror would not have been influenced. But jurors are not that predictable. Fortunately, jurors are not like computers that answer the same question in the same way every time. Instead, jurors exercise broad discretion in evaluating the evidence to arrive at their ultimate conclusions.

Accordingly, I would reverse the conviction and order a new trial to include the testimony of the three excluded defense witnesses.