STATE of Minnesota, Respondent,

v.

Ronald Lewis GREER, Appellant.

Nos. C9–99–1550, C7–00–2154.

Supreme Court of Minnesota.

Nov. 1, 2001.

John M. Stuart, State Public Defender, Lawrence W. Pry, Asst. State Public Defender, Minneapolis, for appellant.

Mike Hatch, Atty. Gen., Thomas R. Ragatz, Asst. Dist. Atty., St. Paul, Amy Klobuchar, Hennepin County Atty., David C. Brown, Asst. Hennepin County Atty., Minneapolis, for respondent.

## OPINION

PAGE, Justice.

Ronald Greer was convicted of first-degree murder in violation of Minn.Stat. § 609.185(1) (1998), and second-degree murder in violation of Minn.Stat. § 609.19(1) (2000), in connection with the July 26, 1998, shooting death of Kareem Brown. Greer raises four issues on this direct appeal: first, whether the trial court

deprived him of the right to an impartial jury by limiting voir dire examination of six prospective jurors regarding their attitudes toward police officers; second, whether Greer was denied due process and the right to confront the witnesses against him by the trial court's refusal to permit him to impeach a state's witness with evidence of a prior conviction; third, whether his right to present a meaningful defense was violated by the trial court's failure to permit him to testify regarding aspects of the circumstances surrounding his pretrial statements to the police; and, finally, whether Greer is entitled to a *Schwartz* hearing to determine the nature and effect of the trial court's ex parte contacts with the jury during trial.

After reviewing each of the issues raised, we are satisfied that, as to the first three, Greer's arguments are without merit. With respect to the fourth issue, because we lack a sufficient record to determine whether the trial court's contacts with the jury were improper, we remand to the chief judge of the Fourth Judicial District for further proceedings.

Brown was shot to death shortly after midnight on July 26, 1998, in south Minneapolis. At trial, the state argued that the murder was committed in retaliation for Brown's alleged theft of money and drugs from Greer. Greer's principal defense was alibi. He contended that he was at the home of a friend when Brown was shot and that a man known as "E" was the killer.

A number of witnesses implicated Greer in Brown's death. Aaron Jones, who knew Greer, testified that he saw Greer with a gun in his hand walking north through the alley between 15th Avenue (15th) and Bloomington Avenue (Bloomington) toward the place where Brown was eventually shot. Ten to twenty seconds later, A. Jones heard between six and nine gunshots coming from the direction in which Greer was headed. He then heard footsteps running south through the alley and the sound of someone opening a trash-can lid and throwing an object into it. A. Jones later picked Greer out of a photo lineup and testified that he was positive it was Greer he saw in the alley.

Somsonaouk Phraviseth testified that he saw two men arguing in the middle of Bloomington while he was waiting in his car at a red light at the intersection of Bloomington and Lake Street. He then saw one of the men fire at the other repeatedly with a dark semi-automatic handgun. The gunman then ran away through a vacant lot. Phraviseth described the gunman as a six-foot tall black male with a medium build, short curly hair, and a goatee, who was wearing dark blue baggy clothing.

Ira Bacon, who lived near the scene of the shooting, testified that he heard someone scurrying through bushes near his house just moments before hearing approximately three gunshots. Bacon then looked out his window onto Bloomington and saw a man fire a "couple more shots." Bacon described the gunman as a five-foot, eight-inch tall black male with a medium build and short hair, who was wearing dark baggy clothes.

Marvin Jones and Frankie Richardson were in M. Jones' apartment watching television when they heard gunshots. M. Jones testified that he then looked out the window onto the alley between 15th and Bloomington and saw a man he later identified as Greer jogging south through the alley with a gun. The man stopped at a trash can with a streetlight directly above it and raised the lid as if to put the gun inside. M. Jones described the gun as a Luger-style, with a long barrel. According to M. Jones, Greer then continued to run south through the alley. Richardson

testified that she heard six or seven gunshots, went to the window, saw a man running south through the alley, and stopped looking when she saw the man pause at a trash can and lift the lid. She described the man as a black male, approximately five-feet-five or five-feet-six inches tall, wearing dark blue or black clothing.

When the police arrived at the scene of the shooting, M. Jones told them what he had witnessed. The police conducted a search of the trash cans in the alley and recovered a long-barreled, Ruger semi-automatic pistol from one of them. Shell casings found near Brown's body were matched to that gun.

Greer was arrested in Detroit, Michigan, on August 11, 1998. Two Minneapolis police officers flew to Detroit and interviewed Greer there the following day. According to the officers, they attempted to tape-record this interview, but when they played the tape back it was blank. Conflicting evidence was offered as to what transpired during this interview. The officers testified that they told Greer that a gun had been found in a trash container and that they thought he was the killer. Greer testified that the officers told him they knew he was the killer, that they had his fingerprints on the murder weapon, and that a 70 year old woman had seen him in the alley the night Brown was shot. According to Greer's testimony, the officers badgered him, calling him a "stone-cold killer" and a "cold-blooded murderer," and kept repeating the evidence they allegedly had against him. He testified that the officers then explained that he would be released if he told them who the killer was. At this point, Greer contends, he told the officers that when Brown was killed he was at the Minneapolis home of a friend by the name of Geneva Benford.

During his testimony, Sergeant Chris Hauglid of the Minneapolis Police Department denied that Greer was told that the police had a witness who saw him running down the alley, denied telling Greer that they had his fingerprints on the gun, and denied telling him that he would be released if he told them who shot Brown. Hauglid also denied that Greer told them he was at Benford's home at the time of the shooting.

Within minutes of the conclusion of this interview, Greer asked the officers to return because he "had a story to tell them." During this second interview, which was tape-recorded, Greer told the officers that he was present at the scene of the shooting. He stated that an individual named "E" was the gunman, and that E was angry at Brown because Brown had stolen money from E. During this part of the interview, Greer gave a somewhat detailed description of how Brown's shooting occurred.

Greer was interviewed a third time by the police on September 25, 1998, in Minneapolis. During this interview, also recorded on tape, he again implicated E as the gunman. He first indicated that he was at Benford's home when Brown was shot and then changed his story, saying he was with E at the time of the shooting.

At trial, Greer testified that, following his arrest in Detroit, he was held overnight in a filthy, rat- and roach-infested cell with only two wooden boards on which to sleep. According to Greer, he told the officers who interviewed him that he was at the scene of the murder just so he could get out of jail. He testified that he was at Benford's home when E shot Brown, that E shot Brown because some of E's drugs had been stolen, and that 95% of what he told the officers on August 12 and September 25 was untrue.

Greer testified that he arrived at Benford's home about 9:30 or 10:00 p.m. on

July 25, 1998, and that he was there playing video games all night with Benford's son, Tad. Greer claimed that E and two other men arrived at Benford's at about 1:30 a.m. on July 26 and told him Brown was dead. According to Greer, he did not inform the police that he was at Benford's during his second interview in Detroit because he did not want to get her involved. At trial, Anthony Harper and Tad Benford corroborated Greer's alibi. Testimony introduced through Claude Garry and Dante Bracey also implicated E in Brown's murder.

### I.

Greer first claims that he was deprived of his right to trial by an impartial jury when the trial court limited his counsel's voir dire of six prospective jurors—Anderson, Stokesbary, Williams, Sweeney, Buckley, and Gilbertson—as to their predisposition to believe that police officers are more credible than other witnesses. Of these, only Buckley and Gilbertson ultimately served on the jury. Of particular concern to Greer was the trial court's refusal to allow his counsel to ask three of the prospective jurors—Sweeney, Buckley, and Gilbertson—whether they believe police officers lie.

■ The United States and Minnesota Constitutions guarantee a criminal defendant the right to an impartial jury. U.S. Const. amends. VI, XIV; Minn. Const. art. 1, § 6; *Ristaino v. Ross*, 424 U.S. 589, 595 n. 6, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976). This right includes the ability to conduct "an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

■ Trial court decisions relating to the conduct of voir dire will not be overturned absent an abuse of discretion. *State v. Chambers*, 589 N.W.2d 466, 474 (Minn.1999). We agree with the commentary to Rule 26.02 of our Rules of Criminal Procedure, which states that trial courts have the responsibility to "restrict or prohibit questions [during voir dire] that are repetitive, irrelevant, or otherwise improper." Minn. R.Crim. P. 26.02, cmt. However, it is an abuse of discretion for the trial court to frustrate the purposes of voir dire by preventing discovery of bases for challenge or inhibiting a defendant's ability to make an informed exercise of peremptory challenges. *State v. Owens*, 373 N.W.2d 313, 315 (Minn.1985); *see also* Minn. R.Crim. P. 26.02, subd. 4(1).

■ The transcript of voir dire in this case indicates that all six prospective jurors were questioned about their predisposition to find police officers more credible than other witnesses. Anderson, for example, was asked twice whether he would give officers a "bump" in credibility, twice whether he would "dig in" to the testimony of police officers, twice whether he would favor the testimony of officers, whether officers are more believable than non-police, whether they can be mistaken, and whether they can be biased and have their own agenda. In response, Anderson indicated that officers can be mistaken or biased, that they are capable of not telling the truth, and that he would critically evaluate the testimony of an officer in the same manner as that of any other witness.

Greer's counsel asked Stokesbary four times whether he would favor police officers, twice whether he would give the testimony of officers the benefit of the doubt, if officers "would always testify truthfully," if it would be difficult to think that an officer did not testify truthfully, and if it would be "virtually impossible for [him] to conclude * * * that a police officer had testified falsely." The trial court asked Stokesbary if officers could be mistaken as

to what they saw or heard, whether they might have an "incomplete perception," and whether they may not recall something properly. Stokesbary stated that he believed police officers might not tell the truth and that officers, like anyone else, can be mistaken. Furthermore, he acknowledged that he would evaluate the testimony of every witness, regardless of their identity or position in life, using the criteria supplied by the judge.

Williams was asked whether he would evaluate the testimony of a police officer and twice asked whether he would tend to favor the testimony of a police officer over that of a lay witness. In response, Williams explained his view that officers' perceptions can be incorrect or influenced by preconceived notions. He went on to state that his evaluation of police officers' credibility would be based on their testimony and his own observations and intuitions.

Greer's counsel asked Sweeney if she would favor testimony given by an officer and if an officer could be "not telling the truth," twice asked whether she would give officers a "bump" in believability, and twice asked whether an officer can be biased. Sweeney stated that police officers should not be treated differently than anyone else. She also indicated that officers can be biased and, like non-police, might not tell the truth.

Buckley was asked whether he would treat the testimony of an officer the same as that of a lay witness, twice whether he would give officers a "bump" in credibility, and three times whether he would "dig in" to their testimony. Buckley's answers demonstrated that he would "absolutely" treat the testimony of an officer like that of any other witness, and that he would

objectively evaluate and "dig in" to officers' testimony to determine whether it was factually based.

Finally, with respect to Gilbertson, Greer's counsel asked if he would treat an officer differently than other witnesses and if officers can make mistakes, be wrong, "or even not tell the truth in a specific situation." Gilbertson stated that police officers are no different from anyone else, and that officers indeed can be wrong and make mistakes.

Greer argues that *State v. Logan*, 535 N.W.2d 320 (Minn.1995), supports his contention that his right to an impartial jury was violated. The issue in *Logan* was whether the trial court erred by not excusing for cause a juror who had expressed a pro-police bias during voir dire.[1] *Id.* at 322–23. Here, there has been no such showing. Unlike the defendant in *Logan*, Greer did not move to excuse Buckley or Gilbertson for cause. Moreover, the record shows that neither Buckley nor Gilbertson harbored a bias in favor of police officers. Again, Buckley stated that he would "absolutely" treat the testimony of a police officer the same as that of any other witness. And Gilbertson stated that he "would listen to [a police officer] like any other person," and that officers are capable of being wrong and making mistakes.

Greer argues that the trial court's rulings prevented him from discovering the basis for any possible challenge for cause. The record does not support this argument. Instead, it demonstrates that Greer's counsel had the opportunity to and, in fact, did inquire extensively as to the state of mind of each of the six prospective jurors on the issue of whether they would find police officers more credi-

---

1. The juror in *Logan* stated that he would favor the testimony of an officer over that of a lay witness, that he did not think officers lie under oath, and that it would be "virtually impossible" for him to conclude that an officer testified falsely. 535 N.W.2d at 322.

ble than other witnesses. Further, Greer's counsel was able to ask a number of questions that explored the prospective jurors' beliefs about police officers' truthfulness and possible bias. Based on our review of the record, we are satisfied that Greer's ability to conduct an adequate voir dire of these prospective jurors was not infringed and that the trial court did not frustrate the purposes of voir dire by preventing Greer from discovering bases for challenge or inhibiting him from making an informed exercise of peremptory challenges. Thus, we conclude that the trial court did not abuse its discretion during the voir dire of the six prospective jurors.

## II.

■ We next address whether the trial court deprived Greer of due process of law and the right to confront the witnesses against him when it precluded Greer from impeaching one of the state's witnesses, Deanna Strom, with evidence of her 1997 conviction for providing false information to the police in violation of Minn.Stat. § 609.506 (2000).

■ The right of an accused to confront the witnesses against him is guaranteed by the United States and Minnesota Constitutions. U.S. Const. amends. VI, XIV; Minn. Const. art. 1, § 6; *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The essence of confrontation is the opportunity to cross-examine opposing witnesses. *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (quoting 5 John Henry Wigmore, *Evidence* § 1395 (3d ed.1940)); *State v. Lanz–Terry*, 535 N.W.2d 635, 640 (Minn.1995). At the same time, trial courts have broad discretion to control the scope of cross-examination. *Davis*, 415 U.S. at 316, 94 S.Ct. 1105; *Lanz–Terry*, 535 N.W.2d at 640–41.

■ To establish a violation of the Confrontation Clause, a defendant must show "that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Lanz–Terry*, 535 N.W.2d at 640 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Davis*, 415 U.S. at 318, 94 S.Ct. 1105; *State v. Pride*, 528 N.W.2d 862, 866 (Minn. 1995) (plurality opinion)). "Bias," this court has explained, "is a catchall term describing attitudes, feelings, or emotions of a witness that might affect * * * testimony, leading [the witness] to be more or less favorable to the position of a party for reasons other than the merits." *Id.* (quoting 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 307, at 389 (2d ed.1994)). Thus, not everything a witness testifies to tends to show bias, and evidence that is only marginally useful for that purpose may be excluded. *Id.*

As the United States Supreme Court has explained,

the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.

*Davis,* 415 U.S. at 316, 94 S.Ct. 1105; *see Lanz–Terry,* 535 N.W.2d at 640.

We conclude that, while evidence of Strom's conviction for providing false information to the police might call into question her general credibility as a witness, it is not the kind of evidence that is likely to reveal the existence of any bias, prejudice, or ulterior motive for testifying against Greer in this particular case. Moreover, as discussed below, the trial court permitted Greer's counsel to cross-examine Strom directly on the subject of bias. Therefore, on the facts presented here, the trial court's exclusion of evidence of Strom's conviction did not rise to the level of a constitutional violation.

The trial court's ruling, however, was a violation of Rule 609(a)(2) of the rules of evidence.[2] Under that rule, evidence of a witness's conviction is admissible for impeachment purposes if the crime "involved dishonesty or false statement, regardless of the punishment." Minn. R. Evid. 609(a)(2). Here, there is no question that the crime underlying Strom's prior conviction involved dishonesty or false statement.

In *State v. Sims,* 526 N.W.2d 201 (Minn. 1994), we clarified that Rule 609(a)(2) does not provide trial courts with discretion to exclude evidence of a prior conviction on the basis that its prejudicial effect outweighs its probative value. *Sims,* 526 N.W.2d at 201; *see also Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 525–26, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989). We see no other basis on which to exclude the evidence. Thus, the trial court violated Rule 609(a)(2) when it excluded evidence of Strom's prior conviction.

■■■■■ Erroneous exclusion of defense evidence is subject to harmless error analysis. *State v. Post,* 512 N.W.2d 99, 102 (Minn.1994). Thus, we must be satisfied beyond a reasonable doubt that an average jury (i.e., a reasonable jury) would have reached the same verdict "if the evidence had been admitted and the damaging potential of the evidence fully realized." *Id.*

We conclude that the trial court's error in excluding the evidence of Strom's conviction for providing false information to the police was harmless beyond a reasonable doubt. The essence of Strom's trial testimony was that A. Jones told her that he had information related to Brown's death within a week of the killing. Within days of hearing this, Strom informed the police that A. Jones had knowledge regarding Brown's murder. The police then contacted A. Jones as part of their investigation. Strom's testimony was in part corroborated by that of Paula Morrison, who testified that A. Jones told her he had witnessed something within a week of Brown's death.

Further, although the jury was not informed of Strom's conviction itself, it did learn of the facts underlying the conviction. During cross-examination, Greer's counsel elicited the fact that Strom had supplied the police with a false name and date of birth. The following exchange then took place:

Q: And that was a lie when you did that?

---

**2.** The trial court's reason for excluding the prior conviction was that Greer failed to give the state notice. The record indicates that defense counsel informed the trial court of its intention to impeach Strom with evidence of a prior conviction at a May 4, 1999, pretrial hearing one day after defense counsel became aware of the conviction. The trial court concluded the pretrial hearing without considering the matter or making a ruling at that time. The trial commenced immediately following the pretrial hearing and Strom testified that same day.

A: That was called false information, yes.

In addition, Strom was cross-examined directly on the issue of bias. She admitted to receiving payments from the police in connection with her testimony in Greer's case and other cases, and discussed the circumstances surrounding the prosecuting attorney's involvement in the dismissal of a loitering charge against her.

Thus, Strom's cross-examination revealed the facts underlying her prior conviction, as well as information suggesting an ulterior motive for her testimony. That cross-examination, along with the fact that Strom's testimony was merely corroborative of A. Jones' testimony and not based on any personal knowledge of Brown's murder, and the fact that her testimony was in part itself corroborated by Morrison, make it clear that, had the excluded evidence been fully realized, the outcome of Greer's trial could not have been different.

### III.

The third issue Greer raises is whether the trial court's limitations on his direct testimony violated his constitutional right to present a meaningful defense. Both the United States and Minnesota Constitutions guarantee criminal defendants the right to present a meaningful defense. U.S. Const. amends. VI, XIV; Minn. Const. art. I, § 7; *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *State v. Greenleaf*, 591 N.W.2d 488, 504 (Minn.1999). That right, however, is not unlimited. *State v. Bjork*, 610 N.W.2d 632, 636 (Minn.2000). Evidence "that is 'repetitive * * *, only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues' " may be excluded. *Crane*, 476 U.S. at 689–90, 106 S.Ct. 2142. Our review of this evidentiary issue is for an abuse of discretion, *State v. Henderson*, 620 N.W.2d 688, 698 (Minn.2001), and any error is subject to harmless error analysis, *Crane*, 476 U.S. at 691, 106 S.Ct. 2142, *Post*, 512 N.W.2d at 102.

Greer claims that he was denied the opportunity to testify about the totality of the circumstances surrounding his pretrial statements to the police. He contends that those circumstances bear on the credibility of those statements. In *Crane*, the United States Supreme Court explained that,

> the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. * * * And, as with any other part of the prosecutor's case, a confession may be shown to be * * * unworthy of belief. Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?

476 U.S. at 689, 106 S.Ct. 2142 (citation omitted).

Here, Greer's counsel wanted to question him about "the amount of force used by police during his arrest; his understanding of what was happening to his friends at his home during the arrest; his prior experiences with Detroit police; the conditions of his incarceration; and what he understood about the focus of the investigation." By this evidence, Greer hoped to show his state of mind at the time of his statements. The trial court ruled that his state of mind was not relevant, but that Greer could testify about what he saw and perceived at the time he was arrested.

Greer was able to present some evidence regarding the circumstances surrounding his pretrial statements and his state of mind at the time. He testified, for instance, that at the time of his arrest "the police had their guns drawn," that he saw them "grab [his girlfriend] from her truck," and that an officer "put his feet in [his] back" and handcuffed him while he was lying on the ground. He also described to the jury the condition of his Detroit jail cell and his inability to fall asleep the night before his interviews with two Minneapolis police officers.

In addition, he testified on the issue of his state of mind during the interviews and explained his motivation for making the statements. He told the jury that he placed himself at the scene of the crime during the second interview in Detroit "[t]o kind of make [himself] into an eyewitness so [he] could get out of jail." Greer also described his state of mind during the September 25, 1998, interview in Minneapolis, explaining:

> I was at first, I was deciding should I tell them the truth or should I tell them the story just so I can get out of here. * * * I'm sitting there thinking and it comes to mind, well, I know exactly what they want. So I tell them what they want so maybe they will let me out which they didn't.

At the same time, Greer was not permitted to testify that shortly after his arrest he heard a police report indicating that there were shots fired at the building where his friends lived. The trial court also excluded Greer's testimony on the subject of his past experiences with the Detroit police, which included a friend being shot at by a police officer.

Based on our careful review of the record, we conclude that Greer was not deprived of his constitutional right to present a meaningful defense. In fact, Greer was able to directly attack the credibility of his pretrial statements by describing for the jury why he admitted to being at the scene. *See id.* The portions of Greer's testimony excluded by the trial court were, by contrast, only marginally relevant to that issue. Although other trial courts might have chosen to admit the excluded testimony, we cannot say that the trial court here abused its broad discretion in not doing so.

## IV.

The final issue presented is whether Greer is entitled to a *Schwartz* hearing under Minn. R.Crim. P. 26.03, subd. 19(6), to uncover the nature and effect of ex parte contacts the trial court is alleged to have had with the jury.

At Greer's sentencing hearing and in affidavits supporting his post-trial motions, Greer's counsel asserted that the trial court judge was seen "repeatedly" entering the jury room "during the trial." The affidavits also make reference to a statement made by the trial court judge during voir dire that it was his practice to enter the jury room to advise jurors regarding scheduling matters.

In a post-trial motion, Greer requested that the trial court judge recuse from deciding whether to grant a hearing on the issue of his ex parte contacts with the jury. The motion sought a hearing on this matter before the chief judge of the district. The same day, Greer filed a motion for a new trial with the chief judge. This motion requested that a *Schwartz* hearing be conducted by the chief judge to determine the nature and extent of the ex parte contacts between the trial judge and the jury. The chief judge denied Greer's motion and ordered that the "Motion for New Trial shall be heard and determined by the [trial court judge] unless and until he re-

cuses himself or is otherwise removed for cause from presiding in this case."

Greer then brought a second motion before the chief judge, this time seeking to have the trial court judge removed. In support of this motion, Greer argued that the trial court judge possessed personal knowledge of disputed evidentiary facts and that his impartiality might reasonably be questioned. The motion was denied by the chief judge. That same day, the trial court judge denied all of Greer's remaining post-trial motions.

 The purpose of a *Schwartz* hearing is to determine whether a jury verdict is the product of misconduct. *Zimmerman v. Witte Transp. Co.*, 259 N.W.2d 260, 262 (Minn.1977). If a defendant learns, either during deliberations or after the verdict is reached, that a court official has had ex parte contacts with the jury, the defendant should move for a *Schwartz* hearing pursuant to Minn. R.Crim. P. 26.03, subd. 19(6). *See State v. Erickson*, 610 N.W.2d 335, 338–39 (Minn. 2000).

 If, on the other hand, a defendant becomes aware of such exposure during the trial proceeding itself, then the proper course of action is to bring the matter to the attention of the trial court at once in the form of a motion for a hearing under Minn. R.Crim. P. 26.03, subd. 9. *See State v. Cox*, 322 N.W.2d 555, 558 (Minn.1982). Rule 26.03, subd. 9, provides:

If it is determined that material disseminated outside the trial proceedings raises serious questions of possible prejudice, the court may on its initiative and shall on motion of either party question each juror, out of the presence of the others, about the juror's exposure to that material. The examination shall take place in the presence of counsel, and a verbatim record of the examination shall be kept.

*Id.*

In this case, there is no dispute that Greer's counsel was aware of the trial court judge's ex parte contacts with the jury at the time they were occurring. Yet counsel made no objection and no record was made. As a result, the opportunity for inquiry pursuant to Rule 26.03, subd. 9, was lost.[3]

Our more serious concern is that when counsel did, in the context of a motion for a *Schwartz* hearing, raise the jury contact issue, the motion was decided by the same trial court judge alleged to have engaged in improper conduct. When a judge presides over a motion hearing to decide whether further inquiry is required into the propriety of the judge's own conduct, it raises questions about the impartiality of the court's decision. Because public trust and confidence in the judiciary depend on the integrity of the judicial decision-making process, we can ill afford to ignore this problem. We stress that nothing in the albeit sparse record indicates that the trial court's consideration of Greer's motion was

---

**3.** We again caution trial courts of the danger of engaging in ex parte contacts of any kind with the jury during trial proceedings. While we have distinguished communications relating to aspects of a pending case from nonsubstantive contacts and mere pleasantries, *State v. Kelley*, 517 N.W.2d 905, 908 (Minn.1994) (noting that a judge should not communicate with jurors outside the presence of the parties "on any aspect of the case itself (as distin-guished from matters relating to physical comforts and the like)"), *see also Cox*, 322 N.W.2d at 558 (holding that a rebuttable presumption of prejudice attaches when a court official has ex parte contacts with the jury on the merits of a criminal case), we note that even innocuous contacts, if made outside the presence of the parties, have the potential to cast suspicion on the fairness and integrity of the trial process.

not impartial. However, the mere appearance of partiality warrants concern. In light of this concern and the inadequacy of the record before us, we remand to the chief judge of the Fourth Judicial District for consideration of Greer's motion seeking a *Schwartz* hearing on the issue of the trial court's ex parte contacts with the jury.

Remanded for further proceedings in accordance with this opinion.

STRINGER, J., took no part in the consideration or decision of this case.