*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-0103**

State of Minnesota,
Respondent,

vs.

Daniel Martez Walker,
Appellant.

**Filed March 9, 2026**
**Affirmed**
**Bond, Judge**

Hennepin County District Court
File No. 27-CR-23-11766

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Elizabeth Scoggin, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Davi E. Axelson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bond, Presiding Judge; Frisch, Chief Judge; and Larson, Judge.

**NONPRECEDENTIAL OPINION**

**BOND**, Judge

In this direct appeal from the judgment of conviction for second-degree intentional murder and unlawful possession of a firearm, appellant argues the district court abused its

discretion by (1) denying his request to admit evidence on the victim's phone showing the victim's involvement with guns and gangs, (2) failing to remove a seated juror who expressed actual bias, and (3) limiting his ability to voir dire prospective jurors about self-defense. We affirm.

**FACTS**

Respondent State of Minnesota charged appellant Daniel Martez Walker with second-degree intentional murder and possession of a firearm by a prohibited person in connection with the shooting death of R.C. *See* Minn. Stat. §§ 609.19, subd. 1(1), 624.713, subd. 1(2) (2022). Walker noticed the defense of self-defense, and the case proceeded to an eight-day jury trial during which the following evidence was received.[1]

At around 1:00 a.m. on June 2, 2023, 19-year-old R.C. attended a house party in Brooklyn Park. The house party was hosted by A.K., who had been at a bar previously that evening with friends. Walker was also at the bar and, while he did not normally socialize with A.K.'s friend group, he decided to go to A.K.'s party. Many people at the party, including Walker and R.C., had never met before.

At some point, R.C., Walker, and at least one other person were sitting near a poker table in the garage when R.C. and others began freestyle rapping. Multiple people saw Walker stand up and, "out of nowhere," shoot R.C. with a purple and black gun as R.C. was sitting in a chair. R.C.'s hands had been in his hoodie or under the table and, upon being shot, he grasped his chest with both hands. When R.C. fell to the floor, witnesses

---

[1] On the first day of trial, Walker stipulated to the fact that he was ineligible to possess a firearm at the time of the offense.

saw that his hands were empty.  One witness saw Walker insulting R.C. as he stood over R.C.'s body.  Another witness, a friend of Walker's, saw Walker approach R.C.'s body, remove a gun, and then leave the garage with two guns.  While the accounts of the witnesses, many of whom were consuming drugs and alcohol, varied in some respects, no one saw R.C. holding or brandishing a gun at the party.  R.C. died as a result of a gunshot wound to the chest.

The next day, police found a purple and black gun during a search of a Brooklyn Park home.  The homeowner told the police that he had purchased the gun from a person, later identified as Walker, who was selling two guns—the purple and black gun and a "ghost gun," a homemade gun with no serial number.  That same day, police apprehended Walker after he tried to flee from an apartment and they later found a ghost gun with a red number 2 stamped into the bottom of the gun's magazine in the apartment.  A DNA profile obtained from the magazine of the ghost gun matched R.C.

As Walker was being booked into jail, a crumpled note fell out of his sock.  One sentence on the note stated, "Tell Jojo I sold the gun with the body on it."  Walker grabbed the note and ate it before the police could finish reading it.  A business card in Walker's wallet had the name "JoJo" on it and police later connected the business card to a person from whom Walker had obtained the purple and black gun.

Walker testified on his own behalf.  Walker stated that, as he was sitting at the poker table, R.C. commented on one of Walker's tattoos.  R.C. then leaned back in his chair and reached toward his waistband, and Walker heard a gun cocking.  R.C. and Walker stood

3

up at the same time and Walker, afraid that R.C. was going to shoot him, shot R.C. in the chest. Walker took the gun from R.C.'s hand and fled the scene.

The jury found Walker guilty on both counts, rejecting his self-defense claim. The district court sentenced him to concurrent sentences of 480 months in prison for second-degree murder and 60 months in prison for unlawful firearm possession.

Walker appeals.

## DECISION

**I. The district court did not abuse its discretion in its evidentiary rulings.**

Walker argues the district court abused its discretion and violated his constitutional right to present a complete defense by denying his requests to introduce screenshots from R.C.'s phone showing R.C. holding a gun that appeared similar to the gun later found in the apartment where Walker was arrested and evidence showing R.C.'s broader involvement with guns and gang activity. Appellate courts "review a district court's evidentiary rulings for abuse of discretion, even when, as here, the defendant claims that the exclusion of evidence deprived him of his constitutional right to a meaningful opportunity to present a complete defense." *State v. Zumberge*, 888 N.W.2d 688, 694 (Minn. 2017). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Hallmark*, 927 N.W.2d 281, 291 (Minn. 2019) (quotation omitted).

The due-process clauses of the state and federal constitutions guarantee that "every criminal defendant has the right to be treated with fundamental fairness and 'afforded a meaningful opportunity to present a complete defense.'" *State v. Richards*, 495 N.W.2d

187, 191 (Minn. 1992) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see also* U.S. Const. amend XIV, § 1; Minn. Const. art. I, § 7.  "The right to present a defense includes the opportunity to develop the defendant's version of the facts, so the jury may decide where the truth lies." *State v. Crims*, 540 N.W.2d 860, 865 (Minn. App. 1995), *rev. denied* (Minn. Jan. 25, 1996).  But the right to present a defense is subject to the rules of evidence, which are "designed to assure fairness and reliability in the determination of guilt."  *State v. Hannon*, 703 N.W.2d 498, 506 (Minn. 2005).

A.   **The district court did not abuse its discretion by excluding screenshots from R.C.'s phone showing R.C. holding a gun two weeks before the offense.**

Walker first argues that the district court abused its discretion by denying his request to admit screenshots of videos on R.C.'s phone showing R.C., about two weeks before the offense, posing with a gun that looked similar to the ghost gun found in the apartment where Walker was arrested.  According to Walker, evidence of R.C.'s recent gun possession "was relevant to show he possessed that same gun on the night of the shooting."

Generally, relevant evidence is admissible. Minn. R. Evid. 402.  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Minn. R. Evid. 401.  Relevant evidence may be excluded, however, if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Minn. R. Evid. 403.

We begin by setting out the proceedings in the district court. Before trial, Walker moved to admit videos from R.C.'s phone as character evidence under Minn. R. Evid. 404(a). As described by the district court, the videos purport to show R.C. in possession of a gun with a red 2 stamp on the magazine, similar in appearance to the ghost gun found in the apartment where Walker was arrested. The videos also show R.C. in cars, both with other people and alone, brandishing guns and making gang signs, which Walker argued showed R.C.'s involvement with gangs and guns. The district court determined that the videos were improper character evidence and denied Walker's motion.

During trial, a police officer testified about the ghost gun found in the apartment where Walker was arrested and the state published a photo of the ghost gun to the jury. Walker renewed his motion to introduce evidence of the videos from R.C.'s phone and offered to introduce only six screenshots from the videos that show R.C. brandishing guns, including a gun with a red 2 stamp. Walker again argued that the screenshots were relevant because they established that R.C. possessed a "very, very similar, if the not the same" gun as the ghost gun found when Walker was arrested and thus tended to prove that R.C. was armed at the time of the offense. The district court denied Walker's motion, ruling that the screenshots were not relevant and any minor probative value was outweighed by the evidence's substantial prejudice. But the court allowed the investigating officer, without describing the photos, to testify that he saw a similar gun with a number 2 on the magazine in photos on R.C.'s phone.

Walker challenges the district court's determination that the screenshots were not relevant, relying on *State v. Smith*, 9 N.W.3d 543 (Minn. 2024). In *Smith*, the supreme

6

court affirmed a district court ruling admitting a video of Smith "wav[ing] around" a gun to establish that he possessed a gun similar to the gun used in the charged offense. 9 N.W.3d at 563. Walker argues that if such evidence was "so conclusively admissible against Smith, it should have been equally admissible in favor of Walker." In *Smith*, the gun itself was never recovered, the video evidence was created mere hours after the shooting, and the video was admitted as prior bad-act evidence under Minn. R. Evid. 404(b) to prove the shooter's identity and opportunity.[2] *Id.* Here, in contrast, the magazine from the ghost gun was introduced into evidence, the videos on R.C.'s phone were made over two weeks before the offense, and the screenshots were not offered as prior bad-act evidence. Thus, *Smith* is inapposite.

We note that, while the district court denied Walker's request to admit the screenshots, it allowed the defense to ask the investigating officer whether photos of a similar ghost gun with a red number 2 stamp were found on R.C.'s phone. The investigator confirmed that he saw such photos and that, although he had seen hundreds of firearms during his career, he had never seen another gun with a red number 2 on the magazine. The magazine of the ghost gun was received into evidence and the jury heard evidence that R.C.'s DNA was found on the ghost gun. In other words, even without the screenshots

---

[2] "Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith" though it may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn. R. Evid. 404(b)(1). In Minnesota, evidence of "prior bad acts" is known as *Spreigl* evidence. *State v. Washington*, 693 N.W.2d 195, 200 (Minn. 2005).

from R.C.'s phone, the jury heard ample evidence tying R.C. to the ghost gun found in the apartment where Walker was arrested. While another district court might have made a different decision on the admissibility of the screenshots from R.C.'s phone, the district court's decision was within the bounds of its broad discretion on evidentiary rulings. *See Marquardt v. Schaffhausen*, 941 N.W.2d 715, 722 (Minn. 2020) ("[T]he fact that other district courts might have made a different decision . . . does not make the district court's decision an abuse of discretion."). Therefore, the district court did not abuse its discretion in determining that the screenshots were not relevant and inadmissible.[3]

### B. The district court did not abuse its discretion by ruling that the state's spark-of-life evidence did not open the door to admission of evidence of R.C.'s bad character.

Walker argues that the state "opened the door" to otherwise inadmissible evidence of R.C.'s bad character because its spark-of-life evidence put R.C.'s character at issue. "Opening the door occurs when one party by introducing certain material creates in the opponent a right to respond with material that would otherwise have been inadmissible." *State v. Valtierra*, 718 N.W.2d 425, 436 (Minn. 2006) (quotations omitted). The doctrine "is essentially one of fairness and common sense, based on the proposition that one party should not have an unfair advantage and that the factfinder should not be presented with a misleading or distorted representation of reality." *Id.* (quotation omitted). Here, Walker contends that he should have been able to introduce evidence of R.C.'s bad character—

---

[3] Walker does not challenge the district court's determination that any probative value of the screenshots was substantially outweighed by the danger of unfair prejudice. *See* Minn. R. Evid. 403.

specifically, the evidence from R.C.'s phone showing R.C.'s alleged association with guns, gangs, and criminal activity—to rebut the evidence of R.C.'s good character.[4]

At trial, the state called R.C.'s mother to provide spark-of-life testimony. R.C.'s mother testified that R.C. was loving, openminded, and a "deep, spiritual old soul." R.C.'s mother also testified that R.C. was close to his family and that, "He was just always there. He just always wanted to be there. He was there at every Thanksgiving, Christmas. He was a homebody. He never ever, ever went out. I never had to worry about him ever."

Walker did not object to the spark-of-life testimony as being unfairly prejudicial or excessive, but he later renewed his motion to admit the evidence from R.C.'s phone. Walker argued, "We have videos of [R.C.] out in cars with his friends, waving guns around, rapping about gang violence, and things like that. Those are all specific instances of conduct that would be relevant to rebut the character evidence that was put forth by the State." The district court denied Walker's motion, reasoning that the videos and other evidence "did not refute" R.C.'s mother's testimony or reflect "any specific instances of violence [or] pertinent trait that would be relevant to the charge in this case," and any

---

[4] Character evidence is generally not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion. Minn. R. Evid. 404(a). But a defendant claiming self-defense may present evidence "of a pertinent trait of character of the victim," Minn. R. Evid. 404(a)(2), such as the victim's reputation for violence, to show that the victim was the aggressor or "that the defendant was reasonably put in apprehension of serious bodily harm," *State v. Penkaty*, 708 N.W.2d 185, 201 (Minn. 2006). On appeal, Walker does not argue that the evidence on R.C.'s phone was admissible on this basis. While Walker briefly refers to Minn. R. Evid. 404(a)(1), that rule relates to character evidence of the accused, not the victim.

probative value "will certainly be outweighed by the danger of prejudice, confusion of the issues, or mislead the jury."

Walker's opening-the-door argument on appeal rests on his contention that R.C.'s mother's testimony "went beyond typical 'spark of life' testimony." "Spark of life" evidence consists of biographical testimony about the victim to show that "[t]he victim was not just bones and sinews covered with flesh, but was imbued with the spark of life." *State v. Smith*, 876 N.W.2d 310, 325-26 (Minn. 2016) (quoting *State v. Graham*, 371 N.W.2d 204, 207 (Minn. 1985)). Accordingly, in homicide cases, "the state may offer information about the victim's life, but may not use it as an attempt to influence the jury's decision on the basis of prejudice or passion." *State v. Buggs*, 581 N.W.2d 329, 342 (Minn. 1998), *overruled on other grounds by State v. McCoy*, 682 N.W.2d 153 (Minn. 2004). Further, the state "may not use [spark-of-life evidence] as a way of avoiding the rules relating to character evidence" under Minn. R. Evid. 404. *State v. Hodgson*, 512 N.W.2d 95, 97 (Minn. 1994).

Walker cites no spark-of-life caselaw, nor any authority for his proposition that the spark-of-life evidence introduced at his trial was impermissibly broad. Caselaw generally reflects that the state has leeway, subject to the district court's gate-keeping authority, to offer spark-of-life testimony in a homicide case. *See State v. Carney*, 649 N.W.2d 455, 463 (Minn. 2002) (concluding that admission of picture showing victim with his family was permissible spark-of-life evidence); *Buggs*, 581 N.W.2d at 342 (concluding that prosecutor's presentation of victim as a "thoughtful, friendly, hard-working" mother of a young child, and showing victim's picture before and after her death, was permissible

10

spark-of-life evidence); *Hodgson*, 512 N.W.2d at 98 (determining that admission of spark-of-life evidence consisting of 45-second video of victim playing basketball presented during emotional testimony by victim's mother was not error). Given this caselaw, Walker's argument that the spark-of-life testimony in this case was so impermissibly broad that it opened the door to evidence of R.C.'s bad character is unavailing.

Further, we discern no clear error in the district court's finding that the evidence from R.C.'s phone did not rebut R.C.'s mother's spark-of-life testimony. Had R.C.'s mother testified that R.C. had no association with guns or gang activity, then perhaps the jury would have been left "with a misleading or distorted representation of reality" sufficient to trigger application of the opening-the-door doctrine. *Valtierra*, 718 N.W.2d at 436 (quotation omitted). But on this record, that was not the case. Because the spark-of-life testimony provided by R.C.'s mother did not put R.C.'s character at issue and open the door to evidence of R.C.'s bad character, the district court did not abuse its discretion.

**II.     The district court did not violate Walker's right to an impartial jury by failing to remove a seated juror for actual bias.**

Walker argues that the district court abused its discretion by failing to remove a seated juror after the juror expressed bias upon realizing during R.C.'s mother's testimony that he knew R.C.'s aunt. Walker contends that the juror's bias rendered him unable to serve and the district court's failure to remove the juror violated his right to an impartial jury and fair trial.

A defendant in a criminal case has a constitutional right to an impartial jury. U.S. Const. amend. VI; Minn. Const. art. I, § 6. "Because the impartiality of the adjudicator

goes to the very integrity of the legal system, . . . the bias of a single juror violates the defendant's right to a fair trial." *State v. Evans*, 756 N.W.2d 854, 863 (Minn. 2008) (quotations omitted). The presence of a biased juror is structural error, requiring automatic reversal. *State v. Fraga*, 864 N.W.2d 615, 623 (Minn. 2015).

"Actual bias is a question of fact which the district court is in the best [position] to evaluate." *Evans*, 756 N.W.2d at 870 (citations omitted). Accordingly, an appellate court's "review of the district court's determination of juror impartiality is especially deferential." *State v. Munt*, 831 N.W.2d 569, 576 (Minn. 2013); *see also State v. Ulrich*, 3 N.W.3d 1, 6-7 (Minn. 2024) (stating that "[t]he reason [appellate courts] give deference [on questions of juror impartiality] is that a district court is best positioned to judge a juror's demeanor, as opposed to an appellate court's review of a cold record"). This broad deference extends to a district court's decision about whether to remove a seated juror during trial. *See State v. Manley*, 664 N.W.2d 275, 2884 (Minn. 2003).

The Minnesota Rules of Criminal Procedure provide that a juror may be challenged for cause if, among other grounds, the juror's "state of mind—in reference to the case or to either party—satisfies the court that the juror cannot try the case impartially and without prejudice to the substantial rights of the challenging party." Minn. R. Crim. P. 26.02, subd. 5(1)(1). If a juror is seated and during trial "becomes unable to serve, an alternate juror must replace that juror." Minn. R. Crim. P. 26.02, subd. 9. In reviewing whether a district court erred by failing to remove a biased juror, appellate courts first review the juror's answers in context and determine if the juror expressed actual bias. *Munt*, 831 N.W.2d at 578. To prove actual bias, "the challenging party must show that the juror

12

exhibited strong and deep impressions that would prevent her from laying aside her impression or opinion and rendering a verdict based on the evidence presented in court." *Id.* at 577 (quotations omitted). If the juror expressed actual bias, we must then determine whether the juror was properly rehabilitated. *State v. Prtine*, 784 N.W.2d 303, 310 (Minn. 2010). A juror is successfully rehabilitated if the juror "states unequivocally that he or she will follow the district court's instructions and will set aside any preconceived notions and fairly evaluate the evidence." *Id.*

Walker's claim of juror bias relates to circumstances that arose after the jury was sworn and trial had begun. During her testimony, R.C.'s mother stated that R.C. had been close to her sister, R.C.'s aunt. Later, a juror told the district court that R.C.'s mother's testimony made him realize that he had gone to school with R.C.'s aunt. The juror stated he had not seen R.C.'s aunt in 20 years and had not been close with her. The district court asked the juror whether anything about the juror's past connection with R.C.'s aunt—who was not a witness at trial—would affect his ability to serve on the jury. The juror replied, "I don't think so."

When defense counsel asked whether the juror's connection with R.C.'s aunt changed how the juror felt about the case, the juror responded:

> I mean, it makes it slightly more personal to be honest, yeah. Like, I can now connect something there. But I like to think I can be impartial, but I now know someone that I didn't expect to know be involved.

After additional questioning by defense counsel, the district court resumed its inquiry:

THE COURT: I guess my question to you is bottom line: Are you willing to continue to follow my instructions and to consider the evidence, listen to the evidence, and apply the law that I give you once you go back in deliberations and work with the rest of the jury and working at a fair decision?
JUROR: Yes, I'll follow the instructions. Yes.

THE COURT: Are you willing to be a fair and impartial juror?
JUROR: Yes.

THE COURT: All right. And knowing that whatever connection you may have to someone that has a relation to the person involved in this case has no bearing on evidence in this case, potentially, do you agree with that?
JUROR: Yeah. Yeah. I mean, is it weird that I know the person's in the room too and everything like that?

THE COURT: You tell me. I'm asking you to—I'm asking you to tell me if you can be a fair and impartial juror and follow my instructions and listen and view the evidence and make a fair decision with the rest of the jury?
JUROR: Yes.

Defense counsel then asked, "How does it make you feel knowing that this person that you know is in the room?" The state objected. The district court sustained the state's objection, reasoning that the juror was already selected and sworn, could not comment on the evidence, and therefore the questioning needed to focus on whether the juror "can continue to be a fair and impartial juror in this case." Defense counsel had no further questions. After hearing arguments from the parties about whether the juror was biased or could fairly and impartially try the case, the district court determined that the juror would continue to serve.

As an initial matter, the state contends that Walker forfeited his argument that the juror was actually biased by failing to ask the district court to remove the juror and replace

14

him with an alternate.[5]  Although Walker did not expressly make that request, the parties

questioned the juror about his potential bias, Walker told the district court that "we do have

a potentially biased juror on the jury because we haven't been able to make sufficient

inquiry," and the district court ultimately concluded that the juror's past connection with

R.C.'s aunt did not meet the criteria of Minn. R. Crim. P. 26.02, subd. 5.  In light of this

record, we conclude the issue of whether the juror exhibited actual bias that made him

unable to serve was adequately brought to the attention of the district court and Walker did

not forfeit this argument.

Turning to the merits, Walker argues that the juror expressed actual bias under

Minn. R. Crim. P. 26.02, subd. 5, when he stated that his past connection with R.C.'s aunt

made "it slightly more personal" and that he did not "think" his past connection with R.C.'s

aunt would affect his ability to serve.  Caselaw addressing actual bias is instructive.  In

*Fraga*, the supreme court concluded that the district court committed reversible error by

seating a juror who disclosed during voir dire that "he knew about the case, had read about

it in the newspaper, and had discussed it with family or friends, including the case details."

864 N.W.2d at 623-24.  In addition, the juror's mother-in-law was a nurse in the emergency

room at the hospital where the victim had been taken and had gone to work the morning

that the victim had been pronounced dead, and the juror also knew "two of the witnesses

---

[5] The state frames its argument in terms of waiver.  But the Minnesota Supreme Court has clarified that forfeiture is the failure to make a timely assertion of a right, whereas waiver is the intentional relinquishment or abandonment of a known right.  *State v. Beaulieu*, 859 N.W.2d 275, 278 n.3 (Minn. 2015).  Consistent with this distinction, we use the word "forfeiture" when referring to the state's argument that Walker failed to make a timely assertion of a right.

on the witness list and [stated] that he would find them more believable based on that familiarity." *Id.* at 623-24. The supreme court concluded that the district court abused its discretion in finding that the juror had not expressed actual bias. *Id.* at 625-26; *see also Prtine*, 784 N.W.2d at 311 (holding that the district court erred by declining to strike a juror for cause when she repeatedly expressed that she "would be more inclined to believe a police officer's testimony").

Here, unlike in *Fraga*, the juror had no actual knowledge of the case and was not familiar with any testifying witness. Unlike in *Prtine*, the juror did not express an opinion as to the believability of any witnesses. Although the juror acknowledged that his past connection with R.C.'s aunt made the case "slightly more personal" because he knew "someone who [was] affected," he had not seen R.C.'s aunt in 20 years and had not been close with her when they were in school. And after disclosing his past connection with R.C.'s aunt, the juror unequivocally stated that he could follow the court's instructions and would be fair and impartial.

Viewed in context, the juror's statements about his past connection with R.C.'s aunt do not demonstrate a "strong and deep impression" that would prevent the juror from setting aside his impression or opinion and rendering a verdict based on the evidence. *Munt*, 831 N.W.2d at 578. Because the record does not establish that the juror expressed actual bias, we need not address whether he was successfully rehabilitated. *Ulrich*, 3

16

N.W.3d at 9.  Accordingly, the district court did not abuse its discretion in declining to remove the juror from the jury.[6]

## III.    The district court did not abuse its discretion by limiting Walker's voir dire of prospective jurors on the legal concept of self-defense.

Walker argues that the district court abused its discretion by limiting his ability to voir dire prosecutive jurors about whether they "could apply the concept of self-defense" to a person who was ineligible to possess a firearm.  Walker contends that the court's restrictions prevented him from discovering prospective jurors' biases, thereby depriving him of his right to a fair and impartial jury.

A criminal defendant has the right to an impartial jury. U.S. Const. amends. VI, XIV; Minn. Const. art. 1, § 6.  The right to an impartial jury "includes the ability to conduct an adequate voir dire to identify unqualified jurors."  *State v. Greer*, 635 N.W.2d 82, 87 (Minn 2001) (quotation omitted); *see also State v. Gillespie*, 710 N.W.2d 289, 295 (Minn. App. 2006) ("The purpose of voir dire is to probe the jury for bias or partiality to enable counsel to exercise informed peremptory challenges and challenges for cause."), *rev. denied* (Minn. May 16, 2006).  A district court may "restrict or prohibit questions during voir dire that are repetitious, irrelevant, or otherwise improper."  *Greer*, 635 N.W.2d at 87 (quoting Minn. R. Crim. P. 26.02 cmt).  Appellate courts review a district court's decisions relating to the conduct of voir dire for abuse of discretion.  *Id.*  A district court abuses its

---

[6] Walker also argues that he "had a right to ask additional questions to determine whether the juror could be rehabilitated" and the district court improperly "thwarted" his ability to do so.  Because we conclude that the juror was not biased, we need not consider this argument. *Ulrich*, 3 N.W.3d at 9.

discretion if it "frustrate[s] the purposes of voir dire by preventing discovery of bases for challenge or inhibiting a defendant's ability to make an informed exercise of peremptory challenges." *Id.*

Before jury selection, Walker's defense counsel asked to question jurors "regarding their ability or willingness to allow a person to claim self-defense when that person is a prohibited person." Defense counsel explained that determining whether jurors had "predispositions" about a person claiming self-defense in a shooting case when the person was ineligible to possess a firearm was essential to discovering grounds to challenge prospective jurors for cause and to assist in making peremptory challenges. The state objected. After further discussion, the court allowed the defense to ask jurors about "their feelings about firearms, laws that prohibit people from possessing firearms, [and] the Second Amendment" but denied Walker's request to voir dire about the legal concept of self-defense.

Walker challenges this ruling as an abuse of discretion. As the district court correctly observed, however, Minnesota law generally prohibits attorneys from questioning potential jurors as to their understanding of legal terms upon which the jury will be instructed by the court. *State v. Evans*, 352 N.W.2d 824, 826 (Minn. App. 1984) ("Attorneys do not have the right to examine prospective jurors as to their understanding of the law to be applied to the case. It is the duty of each juror to follow the instructions of the court, and hence their knowledge or ignorance concerning questions of law is not a proper subject for voir dire." (citing *State v. Bauer*, 249 N.W. 40, 41 (Minn. 1933)).

18

Further, the district court allowed Walker to question prospective jurors in considerable detail about their potential views on Walker's prohibited-person status in the context of the case. The transcript of voir dire reflects that defense counsel asked prospective jurors about their feelings on guns and legal restrictions on gun possession, including restrictions for people who have been convicted of certain crimes. Defense counsel asked how jurors felt "if you hear about a shooting where a shooter wasn't supposed to have a gun in the first place," whether they would "be skeptical if the shooter in that situation says, 'I'm innocent,'" and whether a shooter's "legal rights as far as [their] ability to say they're innocent" would be affected if they were ineligible to possess a gun. And defense counsel was able to tie those questions to the charged offenses. For instance, counsel noted that "Count 2 in this case alleges that Mr. Walker wasn't supposed to have a gun in the first place" and asked whether jurors could "keep an open mind when [they] hear that detail when it comes to [the intentional murder count]." Counsel also asked whether jurors would have "any challenges applying [the presumption of innocence] in the same way that you would be able to if there wasn't a second count here?"

In sum, the record shows that Walker's counsel was able to ask multiple questions to probe prospective jurors' beliefs about the applicability of certain legal concepts to a person charged with a shooting who is prohibited from possessing a firearm. Accordingly, the district court's denial of Walker's request to voir dire on the legal concept of self-defense as applied to the facts of the case did not frustrate the purposes of voir dire by preventing Walker from discovering bases for challenge or inhibiting him from making an informed decision on peremptory challenges. *See Greer*, 635 N.W.2d at 87-89 (holding

19

that the district court did not abuse its discretion by limiting voir dire about the credibility of police officers where it was clear from the record that counsel was permitted to extensively question potential jurors about police credibility).

To support his proposition that he should have been able to ask jurors whether they could apply self-defense to a person who is prohibited from possessing a firearm, Walker relies on *Morgan v Illinois*. 504 U.S. 719 (1992). There, the state was permitted to ask prospective jurors whether they had any beliefs that would prevent them from imposing the death penalty regardless of the facts, but the trial court denied the defense's request to ask whether prospective jurors would "automatically vote to impose the death penalty no matter what the facts are." *Id.* at 723. The Supreme Court concluded that, because the state was allowed to determine which jurors would automatically vote against the death penalty, the same principle supported the defendant's right to identify those jurors who would automatically vote in favor of the death penalty. *Id.* at 733-34.

*Morgan* is distinguishable. The narrow issue in *Morgan* was "whether on *voir dire* the court must, on defendant's request, inquire into the prospective jurors' views on capital punishment." *Id.* at 726. We are not aware of any Minnesota case applying *Morgan*, a death-penalty case, to allow voir dire by attorneys on the legal concept of self-defense. Moreover, while defense counsel in *Morgan* was prevented from exploring prospective jurors' bias as to the death penalty, Walker's defense counsel was able to inquire extensively on prospective jurors' views on gun possession, the Second Amendment, and how Walker's status as a person ineligible to possess a gun might impact jurors' assessment of the presumption of innocence on the homicide charge.

20

Walker also cites *Black v. State*, a decision from the Indiana Court of Appeals. 829 N.E.2d 607 (Ind. Ct. App. 2005). In that case, the trial court granted the state's motion in limine preventing any reference to the theory of self-defense during jury selection, opening statements, and presentation of evidence until self-defense was raised during the defendant's testimony. *Id.* at 609. During trial, the defendant testified that he shot the victim in self-defense and the trial court instructed the jury on self-defense accordingly. *Id.* On appeal, the appeals court agreed with the defendant that the trial court's order prohibiting him from questioning prospective jurors during voir dire about self-defense was fundamental error that denied the defendant's right to a fair and impartial jury. *Id.* at 611 (concluding that "the ability to question prospective jurors regarding their beliefs and feelings concerning the doctrine of self-defense, so as to determine whether they have firmly-held beliefs which would prevent them from applying the law of self-defense to the facts of the case, is essential to a fair and impartial jury").

We agree with the state that *Black* is unpersuasive because it is factually and legally distinguishable. *See Mahowald v. Minn. Gas Co.*, 344 N.W.2d 856, 861 (Minn. 1984) (noting that although decisions from courts of other states are not binding, they may be persuasive). In the district court, Walker clarified that he was not seeking to ask questions about "the principle[] of self-defense." Instead, he sought to probe whether jurors might be "unwilling to apply the concept of self-defense in a situation where a defendant is ineligible to possess a firearm." While the district court did not allow Walker to ask about the legal concept of self-defense, Walker was able to ask prospective jurors about various aspects of gun ownership and possession, and whether they could apply the presumption

21

of innocence on a homicide charge to a person who was ineligible to possess a firearm. Moreover, Minnesota law, unlike the law in Indiana, does not allow attorneys to question potential jurors about legal terms upon which the district court will provide instructions. *See Evans*, 352 N.W.2d at 826. We therefore decline to rely on *Black*, and we conclude that the district court acted within its discretion by prohibiting Walker from asking prospective jurors about the legal concept of self-defense during voir dire.

**Affirmed.**